THE STATE OF CONNECTICUT *vs.* MICHAEL J. GAN-NON ET AL.

Third Judicial District, New Haven, June Term, 1902.

TORRANCE, C. J., BALDWIN, HAMERSLEY, HALL and PRENTICE, Js.

An information charging a conspiracy to cheat and defraud, and alleging acts done in execution thereof, is not bad for duplicity because such acts may in themselves be punishable as crimes.

A cheat accomplished by false and deceitful devices practiced in pursuance of a wrongful combination is indictable as a conspiracy, and it is immaterial whether the object of the conspiracy or the means of its execution would be indictable if unassociated with the conspiracy, as the essence of the offense is the criminal combination.

In a prosecution for a conspiracy to cheat and defraud *A* of the proceeds of a life insurance policy, the trial court charged that if it appeared that the policy had been fraudulently procured, and *A* participated in the fraud against the insurance company, the accused could not be convicted; but if *A* received the money honestly and without knowledge of the fraud practiced upon the company by the accused, they might be found guilty. *Held* that this instruction certainly afforded the accused no cause for complaint.

Counsel may refer in argument to commonly known facts, but cannot use this liberty to get before the jury prejudicial facts not in evidence.

Gannon, one of the accused, testified in his own behalf that he had a valid claim against *A* of about $1,000, and gave the items of the account from memory, none of which had ever been reduced to writing until his attorney had made a typewritten list from the witness' statements. *Held* that this list was properly excluded.

A conspiracy may be established by proof of separate acts of individual conspirators done in accomplishing the common purpose.

After Gannon had testified that he had advanced his sister money on an old claim she had against *A*, with his acquiescence, the sister was called and asked whether, when she got the money of Gannon, she had any talk with him about the prospect of collecting her claim against *A*. *Held* that this inquiry was properly excluded.

Evidence was admitted on behalf of the accused that a person on leaving his house expressed his intention of going to a certain place, but the language in which that intention was expressed was excluded. *Held* that while the reason for this distinction was not obvious, the error could not have harmed the accused.

Section 1630 of the General Statutes (Rev. of 1902, § 1516) provides that the court shall state its opinion to the jury upon all questions of

law arising in the trial of a criminal cause, and submit to their consideration both the law and the facts, without any direction how to find their verdict. *Held* that a charge to the effect that this statute made the jury judges of the law as well as of the facts was erroneous. It is the bounden duty of the jury to accept the law as stated by the court. But when the accused does not object to such instruction, and there is nothing to indicate that the jury did not follow the directions of the court as to the law, the error does not justify a new trial.

Historical review of the trial by jury in Connecticut.

Argued June 10th—decided July 18th, 1902.

INFORMATION in four counts charging conspiracy to defraud, and obtaining money by false pretenses, brought to the Superior Court in Fairfield County and tried to the jury before *Shumway, J.;* verdict and judgment of guilty on the first count only, and appeal by the defendant Gannon for alleged errors in the rulings and charge of the court. *No error.*

The first count charges the defendants with a conspiracy to cheat and defraud John Griffin of $1,700 of his money, stating the devices by which the intended cheat was to be accomplished, with elaborate details, alleges how these devices were in fact practiced, and concludes as follows: " And by reason of all said fraudulent acts of the said defendants, so done by them in furtherance and in pursuance of said conspiracy, and by their said false pretenses, they, the said defendants, unlawfully, feloniously and fraudulently obtained, kept and appropriated to their own use out of said money so belonging to said John Griffin a large sum of money, to wit, about the sum of seventeen hundred dollars, and the said defendants, the said Eugene C. Hill, Lawrence F. Carey and Michael J. Gannon, have by their said acts, conspiracy and false pretenses, cheated and defrauded him, the said John Griffin out of said sum."

The second count charges the defendants with conspiracy to cheat and defraud John Griffin of $1,700 of his money, without stating the manner of the cheat or alleging the consummation of the conspiracy.

The third and fourth counts charge the defendants with

the crime of obtaining from John Griffin $1,700 of his money, by false pretenses.

The defendants Gannon and Carey were convicted, and the defendant Hill was acquitted, on the first count. All the defendants were acquitted on the second, third and fourth counts. The defendant Gannon alone appealed.

The court (*Shumway, J.*) made a finding sufficient to present the questions of law arising in the course of the trial.

The appeal assigns a large number of errors claimed to have been committed by the court in respect to his charge to the jury, and in the admission of evidence.

*Stiles Judson, Jr.*, for the appellant (the accused).

*Samuel Fessenden*, State's Attorney, for the appellee (the State).

HAMERSLEY, J. The defendant assigns as reasons of appeal some twenty exceptions to the charge of the court as given, and to refusals to charge as requested. No one of these exceptions furnishes ground for a new trial. The requests to charge were substantially complied with, so far as material and correct. The numerous isolated passages quoted from the charge, read in connection with the context, and other portions of the charge, are not open to the objections made. It is sufficient to refer, specially, to a few of these objections.

One objection is, that the first count charges a conspiracy to commit the statutory crime of obtaining money under false pretenses, and also charges the commission of that crime, and so the count charges two distinct offenses and is bad for duplicity; therefore the court erred in instructing the jury that under the allegations of that count they might lawfully convict the defendants of the crime of conspiracy to defraud Griffin. The same question was raised by a demurrer to the information, which was overruled, but the overruling of the demurrer is not assigned as error. An information charging a conspiracy to cheat and defraud, may, after describing the

conspiracy, properly allege the acts done in execution and consummation of the intended fraud, and is not bad for duplicity because such acts may be punishable as crimes. *State* v. *Bradley*, 48 Conn. 535, 548.

Another objection, so far as it can be gathered from the reasons of appeal quoting the portions of the charge claimed to be erroneous, and from the argument of counsel, appears to be based upon the following claims and assumptions: The defendant claims that the first count charges a conspiracy to commit the statutory crime of obtaining money under false pretenses, as defined in § 1581 of the General Statutes (Rev. of 1902, § 1415), viz., that of obtaining a sum of money belonging to John Griffin, by false pretenses with intent to defraud him; that it alleged that the false pretenses by which the crime was committed were: (1) that Carey and Gannon had valid claims against Griffin to the amount of $2,000 or more; (2) that the policy of insurance had been fraudulently obtained; (3) that they would return the money to the insurance company; that it appears from the allegations of the count that Carey had rendered services to Griffin, and that Gannon had a valid claim against him for $300, and therefore the falsity of the representation consists merely in an exaggeration of valid, existing claims.

The defendant urges as a matter of law that the exaggeration of a valid claim is not a false pretense, within the meaning of the statute, and also that the information does not aver the falsity of the representation that the policy was fraudulently procured; and that even if its falsity were properly averred, yet it was not a false pretense, inasmuch as it appears from the finding that the State claimed to have proved that the policy was in fact procured fraudulently. As to the representation that they would return the money to the insurance company, the defendant urges that it was plainly their duty to return money fraudulently obtained. The defendant also claims that, upon the facts claimed by the State, the insurance money was not the property of Griffin but belonged to the insurance company, and that even if it could be considered the property of Griffin as against these defendants,

yet if he were a participator in the fraud upon the insurance company, or retained the money knowing it to have been fraudulently obtained, the defendants committed no crime in obtaining from him by false pretenses the money thus fraudulently obtained.

Assuming this construction of the first count and its allegations and these inferences from the finding of the court to be correct, the defendant claims that the court erred in instructing the jury that they might lawfully find Gannon guilty of the crime of conspiracy to defraud Griffin, and erred in several other passages of the charge quoted in the reasons of appeal relating to the crime charged and the evidence supporting it. The real grounds of this objection do not clearly appear in the reasons of appeal; they are pointed out more fully in the brief. It would be unprofitable to discuss this objection as detailed in the argument of the defendant's counsel, not only because some claims urged depend on inferences from allegations in the count which its language does not justify, and others upon questionable inferences from the finding, but also and chiefly because the defendant's counsel has misapprehended the character of the crime set forth in the first count, and this misapprehension renders his main objection to the charge of the court, and much of his argument in support of that objection, inapplicable to the case actually before the trial court and in respect to which the charge was given.

The offense charged in the first count is not a conspiracy to commit the statutory crime of obtaining the money of Griffin by means of false pretenses; its allegations are not adapted—possibly not sufficient—to set forth that offense. The crime charged is the common-law conspiracy to cheat and defraud.

A criminal conspiracy is a combination of two or more persons to commit some crime; whether the crime to be committed is the object of the conspiracy, or the means for the accomplishment of some other object, is immaterial. A combination to unlawfully inflict upon another some injury dependent for its successful accomplishment upon the force of

combination, may also, in certain instances, be a criminal conspiracy, although no act to be done in its execution, or in the consummation of its object, would be a crime if done independently of the combination by any one of the conspirators.

A combination to commit a crime is something more than an intent, although nothing may be done in pursuance of the combination. Each agreeing party entertains an intent to commit a crime, but such intent is not punishable so long as it exists in the mind only. There must be an act of endeavor adapted to effectuate the purpose. State v. Wilson, 30 Conn. 500, 503. The fact of combination is an act of endeavor by each one combining, intended and adapted to effectuate the criminal intent and purpose common to all, and so the mere intent of each, which is not indictable while it exists in the mind only, when it induces and characterizes the act of combination becomes an indictable offense and is called conspiracy.

Conspiracy, therefore, is closely akin to an attempt to commit a crime. It differs from the common-law attempt, in that it is not merged in the crime intended, if that crime is actually committed, as well as in other respects. But in many cases the separating line between the offense of a conspiracy and of an attempt to commit that crime is one difficult to draw; in some cases the facts may support either offense. Two elements, therefore, enter into the crime of conspiracy: wrongful combination and criminal attempt.

The combination of numbers to accomplish a wrongful act is a special danger to public morals, rights of property, and the public peace, and for this reason is treated as an independent offense whenever it is the first step toward the commission of a crime. It is then an attempt to commit a crime, but a joint attempt to commit a crime cannot be punished as a conspiracy, unless there is a combination of such a nature as to increase the danger to the public from the attempt. It is the special danger to the public from wrongful acts that are accomplished through the force of combination, which has induced the courts to treat an attempt to accomplish such acts through the force of combination as a criminal attempt,

although the acts may not be criminal when committed or attempted otherwise than through a wrongful combination for that purpose.

The policy of making conspiracies of this description offenses, has been criticised, and much controversy has arisen in respect to the particular injuries to which criminality will be so imputed when they are accomplished by force of a wrongful conspiracy entered into for that purpose. But that a cheat accomplished through falsehood, deceit and imposition, employed in pursuance of a conspiracy formed for that purpose, is such an injury, cannot be doubted. Many cheats are misdemeanors at common law. The test of such a cheat may be generally stated thus : The fraud by which the victim is injured must be one addressed to the public at large, such for instance, as a false weight or token, and must be executed by means of latent false devices. When a person is cheated by a fraud addressed to him only, not calculated to affect the public at large, the cheat may be a civil tort, but is not a public offense. 2 Whar. on Cr. Law, §§ 1126, 1127.

Some frauds which are not cheats at common law are made indictable by statute, such as obtaining money by inducing the victim to believe false representations as to existing facts. But it is too well settled to be now questioned that a cheat, when accomplished by false and deceitful devices practiced in pursuance of a wrongful combination to that end, is indictable as a conspiracy to cheat and defraud, and in such case, as in all conspiracies, the essence of the offense is the criminal combination; but it is immaterial whether or not the cheat, which is the object of the conspiracy, or the false and fraudulent devices by which it is executed, would be punishable as crimes if unassociated with any conspiracy. *State* v. *Bradley*, 48 Conn. 535, 548; *State* v. *Thompson*, 69 id. 720, 725; *State* v. *Rowley*, 12 id. 101, 111; *State* v. *Glidden*, 55 id. 46, 71; 2 Bish. on Cr. Law, §§ 182, 198; 2 Whar. on Cr. Law, §§ 1337, 1348; 1 Bish. on Cr. Law, § 432; 3 Chit. on Cr. Law, 1139; *Commonwealth* v. *Judd*, 2 Mass. 329, 336; *Commonwealth* v. *Hunt*, 4 Metc. 111, 122; *State* v. *Buchanan*,

5 Har. & John. (Md.) 317, 333 *et seq.; Queen* v. *Warburton*, 1 L. R. C. C. 274, 276.

The use of secret combination, which is itself a fraudulent device, dangerous to the public, imparts to the cheat thus accomplished the necessary element of criminality, and the combination to that·end is a criminal conspiracy.

The first count, with much detail, charges the defendants with conspiracy to cheat and defraud John Griffin out of $1,700 belonging to him, being a part of the proceeds of a check drawn by the Manhattan Life Insurance Company to his order in payment of the amount due him on a policy upon the life of his son, which had been assigned to him, by means of the false and fraudulent devices set forth, namely: by falsely and deceitfully, in the manner stated, obtaining from him a certain writing the nature of which as an unlearned man he could not ascertain for himself, whereby they were enabled to have the check to his order cashed and so get into their hands the money belonging to him for the purpose of defrauding him thereof, by decoying him to the private room of one of the defendants under the pretext of paying him the amount due on said policy and then declining to pay the same under the false pretext that they had valid claims against him amounting to $2,000 or more, and by the assertions of their pretended claims, by threatening to return the whole amount to the insurance company, by asserting that the policy had been fraudulently obtained, and that, if the manner of its procurement were known, said Griffin as well as the defendants would be liable to a criminal prosecution, so confusing and intimidating said Griffin that he was by their said conduct induced to receive the amount of $500 as the amount due him upon said policy, and to place his mark on a paper acknowledging the payment to him of the whole sum of $2,500, although only receiving $500 thereof; and said count further alleges that the said defendants, by their said conduct, devices and conspiracy, did cheat and defraud said Griffin out of $1,700 in money belonging to him.

This count effectively charges a conspiracy to cheat and defraud, and the fraudulent devices set forth are plainly suf-

ficient for that purpose. It is immaterial whether or not the cheat alleged, or any one of the devices by which it was accomplished, unassociated with the conspiracy, would be indictable. The offense charged might be established, whether the assertion of pretended claims constituted a false pretense sufficient to prove the crime of obtaining money under false pretenses, or not, and whether the representation that the policy had been fraudulently procured was true or not. It is apparent that the charge of the court, in instructing the jury that they might lawfully convict the defendants upon proof of the allegations of this count, and in the other passages of the charge quoted in the reasons of appeal, when applied to the offense actually charged and the evidence supporting it, is not open to the objections urged by the defendant's counsel. It is useless to consider what force, if any, those objections might have, were the offense actually charged such as the counsel assumes.

The defendant specially complains because the court told the jury that if it appeared that Griffin was a participator in a fraud upon the insurance company they could not convict the accused of a conspiracy to defraud him of a part of the money so wrongfully obtained from the company; but if they found that Griffin received the money honestly, without knowledge of any fraud on the company, although it may have been practiced by the accused, they might be found guilty of defrauding him of that money, notwithstanding that subsequent to the payment of the policy he might have been informed of the original fraud, and might not, in a civil action by the company, be entitled to retain the money. This statement may be too favorable to the accused, but of that they cannot complain; otherwise it is correct.

The accused, Hill and Gannon, offered testimony of good character. The State's Attorney, during his argument, commented on the effect of such evidence, and in illustration of his claim that existence of good character was not inconsistent with the commission of crime, stated that quite recently a member of the bar of good reputation had in that court room pleaded guilty to the crime of embezzlement. Defend-

State *v.* Gannon et al.

ant's counsel objected to this statement and asked the court to direct its withdrawal. The court did not do so, but in its charge stated fully and correctly the weight to be given evidence of good character and, referring to the statement of the State's Attorney, instructed the jury to lay that statement entirely out of their minds except as an illustration of the well-known fact that men of good character do sometimes commit crimes.

Counsel may properly refer to commonly known facts in illustration of such a proposition.as that prior good reputation may consist with criminal action, but cannot use this liberty to get before the jury prejudicial facts not in evidence. The trial court in this case did not think the liberty had been so abused, and its action is not before us for review. The charge on this subject is not erroneous.

We find nothing in the rulings on evidence which justify a new trial.

Gannon, while testifying in his own behalf, claimed to have had a valid account against Griffin amounting to about $1,000, and testified from memory as to the items of that account. During the examination-in-chief his attorney held a typewritten list of these items, but did not offer it in evidence. During the cross-examination the State's Attorney examined the witness from a duplicate of that list which had been furnished him previous to the trial. Upon cross-examination the testimony of Gannon was conflicting, but he finally said that the list of items, or account from which the attorney had examined him, was a copy of a list of items or account previously made from a statement of items given by him from memory to his attorney, and that at the time of making his pretended claims to Griffin he had no written account against him, and no written evidence of any claim, and that no written account existed until the said first account was so made up from items given his attorney from memory. Upon his redirect examination he identified a paper handed him, as said first account, and a paper from which his attorney had examined him as a copy thereof. His attorney then offered the two papers in evidence. The court properly excluded them.

Griffin, having testified without objection to Carey's entrapping him into placing his mark upon a note, when he owed him nothing, was asked: "Was there any reason that you knew, or any reason that he had given you, why you should give him a personal note at that time?" and answered, "No, sir." The defendant Gannon objected to this question and answer, but the court overruled the objection. Said Griffin subsequently testified that Hill and Carey came to his house and, in the fraudulent manner stated, obtained from him written authority to get the check in payment of the insurance policy cashed, and that Carey then asked Hill, "Has the money all come in?" and Hill answered, "It has all come in direct, and if I get to Bridgeport in time I will despatch New York, and the check will come and you will hear from us in a day or two." This testimony was admitted against the objection of Gannon's counsel to the proof of anything that was done or said by Hill and Carey.

The obtaining of the note by Carey, and the obtaining of the authority to get the check cashed by Hill and Carey, were acts of Carey and of Hill naturally leading to the accomplishment of the common purpose charged, and tending to prove an agreement to accomplish that purpose by such means.

A conspiracy may be established by proof of the separate acts of each conspirator all leading to one object and demonstrating an agreement to effect that object. *State* v. *Thompson*, 69 Conn. 720. The remarks of Carey and Hill were not declarations as to the existence of a conspiracy; they were admissible as a part of the acts done, and their admission was not a violation of the rule excluding the declarations of one conspirator as against the others until a *prima facie* case of conspiracy has been established.

Gannon having testified that in November, 1896, he advanced his sister, Mary G. Eagan, $300 upon her claim against John Griffin for services to him as housekeeper when she was thirteen years old, more than twenty years before, that subsequently he told Griffin he had paid this money for him, who then acquiesced in the payment and that the money

so advanced by him to his sister was one of the valid claims he had against John Griffin,—Mary G. Eagan was produced as a witness and testified that in November, 1896, she borrowed $300 of Gannon, and was then asked: " Will you state to the jury whether at the time of borrowing that money you had any conversation with him about the prospect of collecting your account from your uncle ? "  And : " State to the jury whether the collection of your account against your uncle was considered, discussed with your brother on that occasion."  The court properly ruled that these questions were inadmissible.

The testimony of the witness Johanna Wall, as to the defendant Carey's statement to her, was objected to only on the ground that it was not contradictory.  The court properly held that objection insufficient.

Upon the trial the defendant Gannon's knowledge, prior to the procurement of the policy upon Michael P. Griffin's life, that said Griffin had consumption, became a relevant fact. In relation to this fact one Dr. Lynch testified that in September, 1900, prior to the issuance of said policy, said Griffin called at his office in company with the defendant Gannon, that he made a physical examination of Griffin and then told Gannon that he was suffering from consumption ; that afterwards Griffin came to his office twice, once alone and once in company with Daniel Gannon, a brother of the defendant; that subsequent to these three visits the defendant Gannon called at his office to procure medicine for Griffin. One Edward Gannon, another brother of the defendant, testified that he accompanied Michael Griffin to Dr. Lynch's office on one occasion, and Dr. Lynch did not tell him that Griffin was suffering from consumption.  Dr. Lynch then testified that he had never seen Edward Gannon in company with Griffin at his office.  The defendant then produced his sister Margaret Phelan, who testified that on one occasion during the fall of 1900, Michael P. Griffin and her brother Edward Gannon left the Gannon house where they then all lived to go to the office of Dr. Lynch, and that she knew their destination from the statement of Griffin. as they started to

leave the house.    She was then asked what was said and the court excluded the question.

Evidence of the fact that Edward Gannon and Griffin left the house with the expressed intention of going to Dr. Lynch's, was admitted, but evidence of the language in which this intention was expressed, was excluded.    The reason for this distinction is not obvious, but it is difficult to see how such an error could have injured the defendant in any sense that would justify a new trial.

The other objections to evidence do not call for special mention.

There is, however, an error apparent on the record which requires consideration, notwithstanding the failure to assign it as a reason for appeal.    The court commences the charge thus: " Section 1630 of the General Statutes of this State provides that the court shall state its opinion to the jury upon all questions of law arising in the trial of a criminal cause, and submit to their consideration both the law and the facts, without any direction how to find their verdict.    This statute makes the jury the judges of the law as well as of the facts in the case.    The entire case is submitted for your determination, both the questions of law and the questions of fact.    It is not presumed that you know the law, but it is the duty of the court to instruct you in relation to the law. That is one of the sources of your information.    But in that you are judges of the law, it is not intended that you shall make the law, or that you shall not be governed by the law as it is.    Having once ascertained what the law is, it is as much your duty to follow it as it is the duty of the court."

This language involves an instruction to the jury that it is not their duty to accept the law for the case as stated to them by the court, but is their duty to ascertain and determine that law for themselves, in the exercise of a judicial function; that the opinion of the court is not an authority binding on them, but is one of the undefined sources of information open to the consideration of the jury, and which they are to weigh in settling the law as they weigh the testimony of witnesses in settling the facts.    Such instruction is erroneous.    The

enforcement of the right of everyone to equal protection of the law, which is the same for all, is sometimes difficult, but if this proposition were true and acted upon it would become well-nigh impossible. The proposition cannot be deduced from the statute quoted, and is destructive of the common-law right of trial by jury. The peculiar process through which in this State the common-law trial by jury had become established when our Constitution declared "the right of trial by jury shall remain inviolate," as well as the popular misconstruction which has undoubtedly prevailed in respect to a statute passed to enforce the respective duties of court and jury as fixed by the common law, invites, perhaps demands, a full consideration of those essential features of jury trial which must control the construction of such a statute, even at the risk of restating elementary law and re-examining a line of decisions that have settled the true meaning of jury trial by an overwhelming weight of authority.

Trial by jury is a practical mode of administering justice. It is not the outcome of a perfect theory, but a somewhat cumbrous process developed from diverse experiences and finally adopted as the best attainable in certain kinds of litigation, for ascertaining facts from evidence and applying to them settled principles of law. The triers of fact are selected for each case from the body of the county, in reliance on the probable justice of a conclusion of fact which has received their unanimous approval; the determination of the law is committed to a judge specially trained and equipped for that purpose. It seeks to unite the benefits to be derived from the common sense of average citizens in getting at substantial truth from conflicting testimony, and from the learning and skill of the judge in accurately determining the appropriate law. The process of development has been long. Until after the Revolution of 1688, the practice of jury trial was unsettled and oftentimes chaotic; and its decisive character did not become established until about the close of the 18th century, when this mode of administering justice had become so associated in the popular mind with free government that it was adopted by several of the States, and by the

United States, as a part of the fundamental law. The in-
stitution so adopted was the one then existing under the Eng-
lish common law, and has since remained substantially
unchanged except by constitutional enactment. Its main,
essential feature is, that throughout the whole judicial proc-
ess, from the institution of a case to the final judgment, the
judge determines the law, and the jury determines the facts
referred to them by the pleadings. These powers of judge
and jury are distinct. Lord Hardwicke said in 1734: "If
ever they come to be confounded, it will prove the confusion
and destruction of the law of England." *King* v. *Poole*,
Lee's Cases, Temp. Hardw. 23, 28. As to this essential
feature all are agreed ; no one would now have the hardihood
to deny its existence and fundamental character, and there
has never been any practical difficulty in the exercise of these
distinct powers in the great mass of judicial trials. When-
ever a question of law is presented, whether it concern the
sufficiency of the complaint, the impanelling of the jury, the
admission or rejection of testimony, or the conclusion of law
from the facts admitted or found—the court alone answers ;
whenever the pleadings terminate in an issue of pure fact,
the jury alone answers. It happens, however, that there are
questions—owing mainly to the form of procedure but in
part to the inherent nature of some questions—where the
law and the fact are complicate, where the pure question of
fact cannot be fairly determined except in relation to the law,
and the pure question of law cannot be determined until the
facts are found. It is impossible for the court alone to an-
swer such complicate question without infringing on the
province of the jury, or for the jury alone to answer with-
out infringing on the province of the court. In such a case
it may be practicable for the jury to separate the fact from
the law and to find the facts, leaving the court to then de-
clare the law ; if so, the jury returns a special verdict, find-
ing the facts involved in the complicate question, and the
court declares the law on the facts so found. Here court
and jury still exercise their respective powers separately.
But if such separation is impracticable, the respective powers

of court and jury are preserved by the judge's stating his determination of the law hypothetically—if the facts are so and so, this is the law—leaving the jury to find the fact in view of the law so determined by the judge, by the return of a general verdict. Here the court and jury exercise their respective powers, as it were, jointly ; and the general verdict should express the law as determined by the judge and the facts as found by the jury. These complicate questions result, for the most part, merely from the mode of procedure, *i. e.*, the pleadings by which the question at issue is developed and spread upon the record, and in such cases the separate action of judge and jury may be secured by requiring a special verdict, whereby the jury alone will judge the pure matters of fact and the court alone the pure matters of law ; but there are questions, such as libel, negligence, fraud and guilt in a large class of criminal prosecutions, where the law and the fact are so blended and their relation so subtle as to render their precise separation by a jury impracticable ; and the power to determine whether the law and the facts, complicate in such a question, can be or should be separated, has in criminal cases been given to the jury. When the plea of "not guilty" presents as the issue a question in which fact and law are blended, the jury must still answer to the fact and the court to the law ; but whether that answer shall be given separately, by means of a special verdict, whereby the court determines the law directly upon facts already found by the jury, or shall be given, as it were, jointly by means of a general verdict, whereby the court determines the law hypothetically in respect to the facts as the jury may properly find them, is at the option of the jury. And this option, *i. e.*, the right to return a general verdict upon the issue joined to the jury, is another essential feature in trial of criminal causes by jury. It is evident that as a general verdict involves an application of the law as declared by the court to the facts as found from the evidence, the jury must consider the law in connection with the evidence in reaching their ultimate conclusion, and in this limited sense they may, with doubtful accuracy, be called judges of the law ; but as the law de-

termined by the courts is the law they must consider, it is clear that in no sense which involves any independent determination of what the law of the State is, are they the judges of the law. It is also evident that the jury have thus the power of disregarding the law received from the court, as well as the evidence of witnesses whom they believe, and that the right of the parties to the protection of the law as determined by the court, and to the benefit of the facts as really found by the jury from the evidence, must depend on the honesty of the jury. It is this power of a jury to disregard either the law or fact, and to render a verdict, not as their oaths require " according to law and the evidence before you," but according to sympathy, prejudice, passion, or any fancied obligation to a " higher law," that is regarded by some as a sort of safety-valve essential to the preservation of political freedom, and by others as a weakness inherent in the jury system. It was to induce the abuse of this power that the phrase " judges of the law " was first perverted from the limited sense in which only it can be used; and it so became a favorite euphuism in appeals to juries for a violation of duty. When Col. John Lilburne in 1653 was tried for a violation of the act of banishment which forbade his return to the Commonwealth under pain of death, the law and the facts were conclusive of his guilt; but, supported by a band of armed " levellers " ready to fight in his defense in case he were convicted, he made one of the earliest recorded appeals to the jury to violate their oaths under cover of the phrase, " judges of the law." 5 St. Tr. 445. The example of this lawless though honest opponent of order, in the days when Cromwell was attempting to bring some order out of chaos, has found many followers. During the existence of the " Embargo Act," when in New England opposition to the government neared the border-land of rebellion, violators of the Act, whose guilt was proved beyond question, were acquitted by juries influenced by appeals to substitute political passion for the obligations of their oaths, and the real nature of the appeal was tempered by the euphuism, " judges of the law." 3 Bradford's Hist. of Mass. 108. Instances of a similar kind

are not wanting in more recent times. We cannot discuss the nature of this power or the danger of its abuse. It is involved in the system of jury trial guaranteed by our Constitution. Whether such facility for disregarding both law and facts, when some impulse of lawlessness or patriotism assails the integrity of the jury, is a beneficial result of the right to render a general verdict, is a question of politics: how far a juror can justify himself in yielding to such impulse is a question of conscience; but whether it is an essential feature of jury trial as settled by common law, that the court shall instruct the jury as to what is that law which they must consider with the facts as found by them in reaching a verdict, and that the jury shall accept the law so determined, as the law for the case, in accordance to which they are bound by their oaths to return their verdict, is a question of law. On this question we entertain no doubt.

In 1783 Lord Mansfield said: " The fundamental definition of trials by jury depends upon a universal maxim, without an exception, *ad questionem.* Where the questions can be severed by the form of the pleadings, the distinction is preserved upon the face of the record, and the jury cannot encroach upon the jurisdiction of the court. But where by the form of the pleading the two questions are blended together, and cannot be separated upon the face of the record, the distinction is preserved by the honesty of the jury." *Rex* v. *Dean of St. Asaph,* 3 T. R. 428, 431.

In 1835 Story, J., said: " I hold it the most sacred constitutional right of every party accused of a crime, that the jury should respond as to the facts, and the court as to the law. It is the duty of the court to instruct the jury as to the law; and it is the duty of the jury to follow the law, as it is laid down by the court." *United States* v. *Battiste,* 2 Sumner, 240, 243.

In 1843 the Supreme Court of New Hampshire said: " It is the opinion of the court, that it is inconsistent with the spirit of the Constitution that questions of law, and still less, questions of constitutional law, should be decided by the ver-

dict of the jury, contrary to the instructions of the court.'"
*Pierce* v. *State*, 13 N. H. 536, 554.

In 1845 the Supreme Court of Massachusetts, speaking by
Shaw, C. J., said: " It is the duty of the jury to receive the
law from the court, and to conform their judgment and de-
cision to such instructions, as far as they understand them,
in applying the law to the facts to be found by them; and it
is not within the legitimate province of the jury to revise,
reconsider, or decide contrary to such opinion or direction of
the court in matter of law.   To this duty jurors are bound
by a strong social and moral obligation, enforced by the sanc-
tion of an oath, to the same extent, and in the same manner,
as they are conscientiously bound to decide all questions of
fact according to the evidence."   *Commonwealth* v. *Porter*,
10 Metc. 263, 286.

In 1855 the legislature of Massachusetts enacted that in
criminal prosecutions it should be the duty of the jury to try,
according to established forms and principles of law, all causes
which shall be committed to them, and, after having received
the instructions of the court, to decide at their discretion, by
a general verdict, both the fact and law involved in the issue,
or to find a special verdict at their election."   In 1857 Shaw,
C. J., Metcalf and Merrick, Js., held that this statute did not
purport to allow to the jury the rightful power to determine
against the instructions of the court questions of law involved
in the issue, and the court, speaking by Shaw, C. J., in one
of the most masterly of his opinions, held that the legislature
cannot consistently with the Constitution confer such power
on the jury in criminal trials, and affirmed the decision in
*Commonwealth* v. *Porter*, 10 Metc. 263.   *Commonwealth* v.
*Anthes*, 5 Gray, 185.   Shortly afterwards it was held by the
court, without dissent, that a law changing the nature of jury
trial by making the jury judges of the law was unconstitu-
tional and void.   *Commonwealth* v. *Rock*, 10 Gray, 4.

In 1851 Curtis, J., said: " My firm conviction is, that under
the Constitution of the United States, juries, in criminal
trials, have not the right to decide any question of law; and
if they render a general verdict, their duty and their oath re-

State *v.* Gannon et al.

quire them to apply to the facts, as they may find them, the law given to them by the court." *United States* v. *Morris*, 1 Curtis, 23, 63.

In 1859 the Supreme Court of Rhode Island said: "Whilst, on the one hand, the jury are the sole ultimate judges of the facts, they are, on the other, to receive the law applicable to the case before them, solely, from the publicly given instructions of the court." *State* v. *Smith*, 6 R. I. 33, 34.

In 1863 the New York Court of Appeals, speaking by Selden, J., said: "It is as much the duty of jurors to be governed by the instructions of the court upon legal questions in criminal as it is in civil cases." *Duffy* v. *The People*, 26 N. Y. 588, 591.

In 1874 the duty of the jury to follow the instructions of the court on questions of law was clearly laid down by the Supreme Court of Michigan. *Hamilton* v. *The People*, 29 Mich. 173.

In 1892 the Supreme Court of Vermont said: "We are thus led to the conclusion that the doctrine that jurors are judges of the law in criminal cases is untenable; that it is contrary to the fundamental maxims of the common law from which it is claimed to take its origin; contrary to the uniform practice and decisions of the courts of Great Britain, where our jury system had its beginning and where it matured; contrary to the great weight of authority in this country; contrary to the spirit and meaning of the Constitution of the United States; repugnant to the Constitution of this State." *State* v. *Burpee*, 65 Vt. 1, 34.

In 1895 this question was for the first time formally passed upon by the Supreme Court of the United States. The case was decided upon great deliberation. The opinions of Mr. Justice Harlan, speaking for the majority, and of Mr. Justice Gray, speaking for the minority, cover the whole range of the controversy. The court said: "We must hold firmly to the doctrine that in the courts of the United States it is the duty of juries in criminal cases to take the law from the court and apply that law to the facts as they find them to be from the

evidence." In this conclusion seven of the nine judges concurred. *Sparf* v. *United States,* 156 U. S. 51, 102.

It is true that during the formative period of jury trial, and not infrequently in later times, judges in charging juries have used language of doubtful meaning and sometimes of questionable accuracy; that during times of high political excitement some public men of repute have advocated the right of juries to disregard the law, and that a few jurists of eminence have been led, by the practical result in former times of a general verdict in finally concluding the law in criminal cases, into confounding the physical power to disregard the law by the rendition of a general verdict with the duty imposed upon them by law. But we are satisfied that such expressions and views are repugnant to a most essential feature of jury trial and cannot bear the test of thorough examination. They are uniformly rejected by the courts of the United States, and by the courts of last resort in nearly all the States, where the question has been discussed.

In our own State "trial by jury" has a history in some respects peculiar, and has passed through a developing process of its own. It finally became closely assimilated to the English system, and when in 1818 our Constitution declared "the right of trial by jury shall remain inviolate," it referred to a trial by jury the same in its essential features as the jury trial at common law, which had been adopted by the Constitution of the United States and by the constitutions of other States. *Guile* v. *Brown*, 38 Conn. 237, 243; *State* v. *Main*, 69 id. 123, 127. Connecticut was settled in 1636 by a band of Englishmen who founded the "three river towns" and established an independent government under the name of the "Jurisdiction of Connecticut"; and in 1638 by another band of Englishmen, who established an independent government known as the "Colony of New Haven." These governments were voluntary, and established without authority other than the will of the people, and so remained until the charter of Charles the Second gave to the Jurisdiction of Connecticut the sanction of the law of England, and extended the jurisdiction of the new charter government over the Colony of

New Haven. At the time of this settlement trial by jury in England was in process of development. It was not a well-established political right. The "Star Chamber," which, following the civil law, did not use a jury, still exercised a large jurisdiction, civil and criminal. New Haven, in pursuance of the analogy of the civil law, had no jury trial. The word "jury" is not to be found in its records or printed laws. Connecticut was more influenced by the common law, and made free use of the jury, but mainly in civil actions. It was, however, a jury of its own invention, and subordinate to the court even in matters of fact. The only court of this period was the "General Court," exercising all judicial, legislative and executive functions. There was no regular judicature. The General Court from time to time authorized some of its members to hold a "Particular Court," mainly for the trial of causes. Civil actions tried by the Particular Court were usually tried by a jury, but all actions tried by the General Court, and most misdemeanors wherever tried, were disposed of by the court without a jury. In 1643 it was ordered that a majority of the jury might render a verdict, and in case of equal division the court should decide the facts. 1 Col. Rec. 84. In 1644 the trial of all cases under forty shillings was left to the magistrates, and in all jury trials the court was directed to send the jury to a second consideration if it deemed the verdict not according to evidence, and if the jury continue in their former opinion, to impanel another jury, or at its discretion to vary and alter the damages given in by the jury. The court, also, was authorized to impanel a jury of six or twelve, and the agreement of four or eight was to stand for a verdict. 1 Col. Rec. 118. It is clear that the trial by jury, as first used, involved not only the absolute determination of all matters of law by the court, but a considerable power in determining facts. The charter of 1662 practically authorized and confirmed the government already established by the people, secured to them the legal title to their lands, and the authority of English law for the exercise of their jurisdiction; but it incorporated all the freemen as a body politic in subjection to the

English government, and guaranteed to each subject of the King inhabiting the colony. "all liberties and immunities of free and natural subjects within any of the dominions of us." While the colonists stoutly maintained their right under the charter to legislate as an independent government in respect to their internal affairs, they recognized the dangers of a forfeiture of their charter through any infringement of the "liberties" of English subjects. By this time trial by jury in England had made a considerable advance. After the abolition of the Star Chamber and the experiences of the great rebellion, it was beginning to be regarded and acknowledged as a political right, and was doubtless looked upon by the colonists as one of those "liberties" referred to in the charter. At all events they began directly to assimilate jury trial here to jury trial in England, not by restricting the power of the judge in declaring the law—that was in accordance with English law—but by enlarging the power of the jury in determining facts, by establishing the number at twelve, requiring unanimity for a verdict, and securing the right to jury trial in criminal as well as in civil cases. The Revision of 1672 provides more carefully for a special verdict upon which the court shall declare the law in accordance with English practice, guarantees to all persons tried for "life or banishment" a jury of twelve whose verdict must be unanimous (this is the first guarantee of jury trial in criminal cases, and the only statutory provision respecting unanimity, until the Constitution of 1818, although the practice became uniform, as of course, after the common law jury trial was once adopted), and defines the duty of juries in accordance with the settled doctrine of the common law : " And all cases, where the debt or damage shall exceed forty shillings, they shall be tried by a jury of twelve men, which men shall be impanelled and sworn truly to try betwixt party and party who shall find the matter of fact with the damages and costs according to law and their evidence, and the judges shall declare the sentence, or *direct the jury to find according to the law*." Rev. of 1672, p. 37. This definition applied to both civil and criminal cases. In 1693 the General

Court ordered for the better regulating of proceedings, " *espe-cially* in the trial of *capital and criminal cases*," that the jury should be kept confined until they agreed upon a verdict, " unless in case of some difficulty arising among them about the matter given them in charge they desire *farther light or information from the court*," in which case they might return to court, and afterwards be confined as before.    4 Col. Rec. 98.    This is the only authoritative decision of the General Court in respect to the relative duties of the court and jury, until the Act of 1812.    It was also provided that parties to civil actions might by mutual agreement have their cases tried by " bench or jury," and that " the like liberty shall be granted to all persons in any criminal cases."    Rev. of 1672, p. 67. This is the first recognition of the right to jury trial in all criminal causes.    After the overthrow of the Andros usur-pation through the Revolution of 1688, the colonists were in mortal dread lest the new king might take advantage of their past conduct for obtaining a forfeiture of their charter. No intimation of favorable treatment could be obtained until 1696, and the uncertainty continued for some time longer. During this period the jury trial was assimilated still more to the common law by the provision of 1693, just mentioned, and the repeal in 1694 of the order authorizing the court to impanel another jury whenever dissatisfied with their finding of fact.    4 Col. Rec. 129.    These several provisions were incorporated into the Revision of 1702, upon which the Gen-eral Court and various committees had labored continuously since 1696.    The right of jury trial was given in cases under forty shillings, upon paying " the whole charge of the jury," and " the like liberty of a jury is hereby granted to all per-sons brought for a delinquency, to any of the County Courts, or Courts of Assistance."    All juries are to consist of twelve men.    The control of the court was extended by allowing a jury to be sent to a third consideration ; and the peculiar right to review was established, by which either party as a matter of right might insist upon two, and in some cases three, trials.    Rev. of 1702, p. 2 *et seq.*    In the Revision of 1702 the section relating to the duty of juries to find the mat-

ter of fact, and of the judge to declare the law, omits the words contained in the Revision of 1672, " to direct the jury to find according to law." This omission is evidently due to the same reason that induced the omission in later revisions of the provision requiring a unanimous verdict, and of other principles of common law, after they had once been adopted by an order of the General Court. Both the unanimous verdict and the direction to find according to law, were involved in the very nature of the jury trial adopted after the granting of the charter; they were specified when that change was being made, but were assumed in subsequent revisions as inhering in the common law then adopted. There are other reasons also which make this clear, but involving too much detail for statement here. From 1702 to 1812 there was no legislation substantially affecting the nature of jury trial. There grew up, however, a practice of judges stating to juries the claims of counsel as to facts and law, without the expression of any opinion by the court, and which applied equally in civil and criminal cases. It is difficult to account for the origin of this practice. Perhaps it may be found in the weakening of the bar after the first generation of colonists—some of whom had received a legal education in England—had passed away, in the impossibility of supplying trained lawyers for the increased number of judges required for the Superior and County Courts, and in the fact that under the law of review each case might be tried again, once or twice, without any reference to the legality of the proceedings or the correctness of the verdict. The law of review was repealed in 1762 (12 Col. Rec. 77), but the practice remained. It was doubtless a part of the general looseness of practice that prevailed toward the close of the last century. Doctor Lyman Beecher stated in an article published on the death of Tapping Reeve, that JUDGE REEVE was wont to describe the practice prevailing by general consent, at the time he entered the bar, as regardless of the most clearly settled principles of law. That such practice was not in accordance with the duty belonging to the judges, is unquestionable. In 1784 the legislature sought to suppress the growing evil, by requiring the

judges to file written opinions, so that "a foundation be laid for a more perfect and permanent system of common law." In 1807, by an Act declaratory in its nature, the judges of the Superior Court were authorized to institute rules of practice. Compil. 1808, p. 221. Immediately the judges adopted the following rule: "The presiding judge, in charging the jury, shall state to them the several points of law which may arise, and declare to them the opinion of the court thereon." So the unlawful practice ended, and the duty of the judge "to direct the jury to find according to law," declared by the General Court as essential to jury trial in 1672, was enforced. Shortly afterwards that lawless practice was condemned by the General Assembly by an Act passed in 1812, which declared: "It shall be the duty of the Superior, County, and City Courts, in committing any cause, whether civil or criminal, to the jury, to state to them their opinion as to the law arising on the case, and to submit to them the questions of fact without any opinion thereon." Public Acts of 1812, p. 106. In 1816 this court had occasion to refer to the practice condemned by the rule of court in 1807, and by the legislature in 1812, and CHIEF JUSTICE SWIFT said: "The usage was to state to them the testimony and the law, as claimed by each party, avoiding, with the utmost caution, any hint of their opinion with respect to either. . . . Though for a long time this right of the jury was deemed so sacred that our courts did not venture to change the practice, yet when they *assumed their constitutional authority* to direct the jury in questions of law, so palpable was the propriety of it, that it met with immediate approbation." And a clause in the brief of Daggett (afterwards Chief Justice), in the same case, is significant: "Hence the maxim of the good old common law, *ad questionem facti non respondent judices; ad questionem legis non respondent jurators.* From this maxim no court in Connecticut has yet departed." *Bartholomew* v. *Clark*, 1 Conn. 472, 478, 481.

We think a careful study of our colonial history, notwithstanding the gross anomalies of practice that obtained before the limits of our common law were defined and preserved in

recorded opinions of the Superior Court, demonstrates that
the essential feature of trial by jury as a political right, in-
volving, as CHIEF JUSTICE SWIFT said, the "constitutional
authority" of the court to "direct the jury in questions of
law," was adopted as a part of our common law shortly after
the grant of the charter of 1662, and that when our Declara-
tion of Rights was framed in 1818, the "right of trial by
jury," with its well known essential features as then estab-
lished by our common law, was one of those "liberties and
rights" recognized and established and declared to be forever
after "inviolate." There are three references to "jury" in
the Declaration of Rights; but only one declaration as to
the "right of trial by jury." Section 9 defines the personal
rights of a person accused of crime. He shall have the right
to be heard by himself and counsel, to demand the nature
and cause of the accusation, to be confronted by witnesses
against him, to have compulsory process to obtain witnesses,
and (in prosecutions by indictment and information) to "a
speedy public trial by an impartial jury." This relates mainly
to the personal right to a "speedy public trial," and by "jury,"
in the defined class of prosecutions; the nature and character
of "trial by jury," as a political right, are contained in the
broad language of § 21: "The right of trial by jury shall re-
main inviolate," *i. e.* the institution of jury trial, in all its es-
sential features as derived from our ancestors and now existing
by force of our common law as a political right, shall not be
changed, but shall remain inviolate. The compass of this
provision is illustrated by the single exception in § 7, which
provides that in prosecutions for libel "the truth may be given
in evidence, and the jury shall have the right to determine the
law and the facts, under the direction of the court." This
section was framed in view of the long struggle for a greater
license in discussion of political questions than was practi-
cally permitted by the rules of common law. It partially
adopted Fox's Libel Bill of 1792, by which the struggle in
England was for a time closed, after the practical, compromis-
ing fashion of English legislation. It changed a common-
law rule of evidence, anticipating a similar change in England

State *v.* Gannon et al.

(Pickering's Statutes, 6 and 7 Vict. Cap. 96), and also the practical operation of a general verdict, in this peculiar offense. Any further comment on this section is uncalled for now; it is enough that in providing a special rule in respect to this particular proceeding, the binding character of § 21, in respect to all other proceedings, when it declares that the essential features of jury trial as established by the common law shall remain inviolate, is most significantly emphasized. In 1820, a committee consisting of Zephaniah Swift, Lemuel Whitman and Thomas Day, were appointed to revise the statutes. JUDGE SWIFT tells us that this appointment was made for the special purpose of bringing legislation into greater harmony with the Constitution just adopted. In the performance of that duty they revised the law of 1812, enforcing the duty of the judge to direct the jury in matters of law. That Act properly covered both civil and criminal cases, and its purpose was simply to enforce a common-law duty. In revising the Act the nature of that duty is more fully defined, and is stated both under the head of civil actions and criminal proceedings. The full definition applicable to all cases is given under the head of civil actions. It shall be the " duty of the court to decide all questions of law arising in the trial of a cause, and in committing the cause to the jury, to direct them to find accordingly, and to submit all questions of fact to the jury, with such observations as they may think proper on the evidence, for their information, without any direction how they shall find the facts." Rev. of 1821, p. 49. Under the head of criminal prosecutions this essential feature of the duty of the court to direct the jury in all questions of law is briefly repeated, and the other essential feature, *i. e.* the right of the jury to return a general verdict—so important in criminal cases—is specially emphasized. It shall be the " duty of the court to state their opinion to the jury, upon all questions of law, arising in the trial of a criminal cause, and to submit to their consideration both the law and the fact, without any *direction how to find a verdict.*" Rev. of 1821, p. 174. These two sections, together, constitute the revision of the Act of 1812 enforcing the duty of the court " in committing

any cause, whether civil or criminal, to the jury," to direct the jury in all questions of law in pursuance of that "constitutional authority," which this court had in 1816, speaking by JUDGE SWIFT, declared to be essential to the common-law "right of trial by jury," and which the Constitution of 1818 had preserved inviolate. This law of 1821 has remained unchanged in substance, and is contained in §§ 1101 and 1630 of the General Statutes (Rev. 1902, §§ 753, 1516).

It cannot fairly be claimed that the law of 1821, which revised the Act of 1812 for the purpose of bringing the language of that Act more fully into accord with the declaration of the Constitution that the right of trial by jury shall remain inviolate, must be construed as taking from the court, in all criminal cases, the power and duty to direct the jury in questions of law, and as giving to the jury the power and imposing on them the duty of reviewing the opinion of the court and of determining the law as judges. Such a construction of the Act of 1821 is untenable; so construed the Act would impair the right of trial by jury in its most essential feature; its language does not require, even if it will allow, such a construction. It is therefore unnecessary to consider the proposition affirmed by the Supreme Court of Massachusetts in *Commonwealth* v. *Anthes*, 5 Gray, 185, 236, and *Commonwealth* v. *Rock*, 10 id. 4, that a law which prescribes "that the jury, consistently with their duty, may decide the law, upon their judgment, contrary to the decision and instruction of the court before whom the trial is had, as received and understood by them," is "beyond the scope of legitimate legislative power, repugnant to the Constitution, and, of course, inoperative and void."

It is true that a loose notion has prevailed with some of the profession in respect to the use of the phrase, "the jury are judges of the law;" and that occasionally a judge at *nisi prius* has endeavored to throw a portion of that responsibility which the law puts upon him, upon the jury; but in general, trial courts have performed their duty in directing the jury in matters of law. The question usually arises where guilt may depend on the meaning of statute or common law, and the

court instructs the jury that if they find upon the evidence
the accused did the acts alleged, such acts constitute in law
the crime charged, and it will be their duty to convict; such
instruction has been uniformly approved by this court both
before the Constitution of 1818 (*State* v. *Carrier*, 5 Day, 131;
*State* v. *Smith*, ibid. 175) and since. It is sufficient to re-
fer to a few cases. In 1819, a charge that if the jury
found certain "facts to be proved they must find the defend-
ant guilty," was affirmed. *State* v. *Ellis*, 3 Conn. 185, 186.
In 1867, where the guilt of the accused depended on proof of
certain facts in connection with the meaning of the statute
creating the crime charged, the trial court charged the jury:
"If, from all the evidence in the case, you are satisfied beyond
any reasonable doubt" of these facts (reciting the material
facts claimed to have been proved), then "it will be your
duty to render a verdict of guilty." This was affirmed.
*State* v. *Tuller*, 34 Conn. 280, 287. In the recent carefully
considered case of *State* v. *Fetterer*, 65 Conn. 287, 293, where
guilt depended on the question whether the conduct of the
accused as proved made him a "peddler," within the mean-
ing of an Act regulating the business of "peddlers," we held
that an instruction that "if the jury finds that the accused
was a regularly employed driver," etc., (detailing all the
facts as admittedly established by the evidence), "then the
driver is not a peddler, and your verdict should be, 'Not
guilty,'" to be correct in law, and granted a new trial because
such instruction was refused. The cases of *State* v. *Buckley*,
40 Conn. 246, and *State* v. *Thomas*, 47 id. 546, while practi-
cally maintaining the duty of the jury to follow the instruc-
tions of the court, do nevertheless, although without any dis-
cussion of the statute or consideration of the vital principle
affected, assume that the Act of 1821 made the jury "judges
of the law." Both cases were liquor prosecutions, where the
judge was asked to instruct the jury that they were judges of
the law and had the right to decide the liquor Act to be un-
constitutional; in the former case the judge told the jury
that they could not decide the Act to be unconstitutional,
without disturbing the foundations of the law; and in the

latter case, for the jury to decide that the section in question was not valid would be an absurdity. Both cases were here decided correctly in holding that the defendants could not complain of such instructions; but were clearly wrong if they can be regarded as assuming that in this State the jury can lawfully disregard the law as stated to them by the court, and to this extent they are overruled. These cases were substantially overruled, in this particular, by our decision in *State* v. *Main*, 69 Conn. 123, 132, *et seq*. In that case we held that the jury could not, without a violation of their oaths, disregard the law as stated to them by the court in respect to the constitutionality of a statute. We did not then directly decide the broader question now under discussion, but the essential features of the right of trial by jury, as secured by our Constitution, were fully considered, and the position taken by the court, in the argument supporting the decision then made, naturally and logically leads to the conclusion now announced.

The error of the trial court, in the passage quoted from the charge, has more or less infected the charge in several cases recently before us, and it is important that such error should be exposed and the law clearly established. This is none the less true because in most cases the error may not practically affect the trial. Juries ordinarily follow the instructions of the court, even when erroneously told that it is their duty as judges to determine the law; but such illegal instruction is liable at any time to produce a serious miscarriage of justice. There is rarely any need for the court to advise the jury of their duty to follow its instructions in matters of law, but when by reason of a request to charge, or for other reason, some instruction in a criminal cause is necessary, it will ordinarily be sufficient to tell the jury that it is their duty to accept the law for the case as stated to them by the court, applying that law to the facts as they may find them, and, in accordance with the facts and law thus submitted to their consideration, to return a general verdict, and that the court cannot direct them how to find the verdict.

An accused person as well as the State is entitled to a trial where the respective duties of court and jury are lawfully ob-

served.　Had the defendant in this case requested the court to correctly instruct the jury in respect to their duty in matters of law, or excepted to the erroneous instruction given when made, he would have some ground to claim that the error of the court might have affected him injuriously.　But this was not done, and we find nothing in the record to indicate that the defendant could have been injured by the charge, or that the jury did not follow the directions of the court as to the law.　We think the contrary fairly appears, and that the error does not, therefore, justify a new trial.

There is no error in the judgment of the Superior Court.

In this opinion the other judges concurred.