374

## STATE OF CONNECTICUT *v.* JERRY D. DANIELS
### (12948)
### (12963)

PETERS, C. J., HEALEY, SHEA, CALLAHAN, GLASS, COVELLO and HULL, Js.

Argued February 11—decision released May 10, 1988

*C. Robert Satti, Sr.,* state's attorney, with whom was *John M. Massameno,* assistant state's attorney, for the appellant-appellee (state).

*Joseph G. Bruckmann,* assistant public defender, with whom were *Joette Katz,* public defender, and, on the brief, *Gerard A. Smyth, Jon C. Blue, Kent Drager* and *Suzanne Zitser,* assistant public defenders, for the appellee-appellant (defendant).

PETERS, C. J. This case concerns the construction of Connecticut's death penalty statute, General Statutes (Rev. to 1983) § 53a-46a.[1] After trial to a three

---

[1] General Statutes (Rev. to 1983) § 53a-46a provides: "HEARING ON IMPOSITION OF DEATH PENALTY. AGGRAVATING AND MITIGATING FACTORS. (a) A person shall be subjected to the penalty of death for a capital felony only if a hearing is held in accordance with the provisions of this section.

"(b) For the purpose of determining the sentence to be imposed when a defendant is convicted of or pleads guilty to a capital felony, the judge or judges who presided at the trial or before whom the guilty plea was entered shall conduct a separate hearing to determine the existence of any mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime, including any mitigating factor set forth in subsection (f), and any aggravating factor set forth in subsection (g). Such hearing shall not be held if the state stipulates that none of the aggravating factors set forth in subsection (g) of this section exists or that one or more mitigating factors exists. Such hearing shall be conducted (1) before the jury which determined the defendant's guilt, or (2) before a jury impaneled for the purpose of such hearing if (A) the defendant was convicted upon a plea of guilty; (B) the defendant was convicted after a trial before three judges as provided in subsection (b) of section 53a-45; or (C) if the jury which determined the defendant's guilt has been discharged by the court for good cause, or (3) before the court, on motion of the defendant and with the approval of the court and the consent of the state.

"(c) In such hearing the court shall disclose to the defendant or his counsel all material contained in any presentence report which may have been prepared. No presentence information withheld from the defendant shall be considered in determining the existence of any mitigating or aggravating factor. Any information relevant to any mitigating factor may be presented by either the state or the defendant, regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters, but the admissibility of information relevant to any of the aggravating factors set forth in subsection (g) shall be governed by the rules governing the

judge court, the defendant, Jerry D. Daniels, was found guilty of one count of murder in the death of Christine Whipple pursuant to General Statutes (Rev. to 1983)

admission of evidence in such trials. The state and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any mitigating or aggravating factor. The burden of establishing any of the factors set forth in subsection (g) shall be on the state. The burden of establishing any mitigating factor shall be on the defendant.

"(d) The jury or, if there is no jury, the court shall return a special verdict setting forth its findings as to the existence of any aggravating or mitigating factor.

"(e) If the jury or, if there is no jury, the court finds that one or more of the factors set forth in subsection (g) exists and that no mitigating factor exists, the court shall sentence the defendant to death. If the jury or, if there is no jury, the court finds that none of the factors set forth in subsection (g) exists or that one or more mitigating factors exist, the court shall impose a sentence in accordance with subdivision (1) of section 53a-35a.

"(f) The court shall not impose the sentence of death on the defendant if the jury or, if there is no jury, the court finds by a special verdict, as provided in subsection (d), that any mitigating factor exists. The mitigating factors to be considered concerning the defendant shall include, but are not limited to, the following: That at the time of the offense (1) he was under the age of eighteen or (2) his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution or (3) he was under unusual and substantial duress, although not such duress as to constitute a defense to prosecution or (4) he was criminally liable under sections 53a-8, 53a-9 and 53a-10 for the offense, which was committed by another, but his participation in such offense was relatively minor, although not so minor as to constitute a defense to prosecution or (5) he could not reasonably have foreseen that his conduct in the course of commission of the offense of which he was convicted would cause, or would create a grave risk of causing, death to another person.

"(g) If no mitigating factor is present, the court shall impose the sentence of death on the defendant if the jury or, if there is no jury, the court finds by a special verdict as provided in subsection (d) that (1) the defendant committed the offense during the commission or attempted commission of, or during the immediate flight from the commission or attempted commission of, a felony and he had previously been convicted of the same felony; or (2) the defendant committed the offense after having been convicted of two or more state offenses or two or more federal offenses or of one or more state offenses and one or more federal offenses for each

§ 53a-54a,[2] one count of capital felony in the deaths of Christine Whipple and Amy Russell pursuant to General Statutes (Rev. to 1983) § 53a-54b (8)[3] and one count of sexual assault in the second degree concerning

---

of which a penalty of more than one year imprisonment may be imposed, which offenses were committed on different occasions and which involved the infliction of serious bodily injury upon another person; or (3) the defendant committed the offense and in such commission knowingly created a grave risk of death to another person in addition to the victim of the offense; or (4) the defendant committed the offense in an especially heinous, cruel or depraved manner; or (5) the defendant procured the commission of the offense by payment, or promise of payment, or anything of pecuniary value; or (6) the defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value."

[2] General Statutes (Rev. to 1983) § 53a-54a provides in relevant part: "MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (1) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a), on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony."

[3] General Statutes (Rev. to 1983) § 53a-54b provides: "CAPITAL FELONY DEFINED. A person is guilty of a capital felony who is convicted of any of the following: (1) Murder of a member of the division of state police within the department of public safety or of any local police department, a chief inspector or inspector in the division of criminal justice, a sheriff or deputy sheriff, a constable who performs criminal law enforcement duties, a special policeman appointed under section 29-18, an official of the department of correction authorized by the commissioner of correction to make arrests in a correctional institution or facility, or of any fireman, as defined in subsection (10) of section 53a-3, while such victim was acting within the scope of his duties; (2) murder committed by a defendant who is hired to commit the same for pecuniary gain or murder committed by one who is

Christine Whipple pursuant to General Statutes (Rev. to 1983) § 53a-71.[4] At the penalty stage, the defendant elected a trial by jury. The jury found the existence of an aggravating factor but was unable to reach a unanimous decision about the existence of a mitigating factor. The trial court then sentenced the defendant to two consecutive terms of life imprisonment for murder and for capital felony and a consecutive term of imprisonment of ten years for sexual assault. Both the state and the defendant appeal. We remand to the trial court with direction.

## I

The three judge court could reasonably have found the following facts. On June 16, 1984, the day of the murders, the victim, Christine Whipple, shared a two-bedroom apartment with Mary Strong on Peck Street

hired by the defendant to commit the same for pecuniary gain; (3) murder committed by one who has previously been convicted of intentional murder or murder committed in the course of commission of a felony; (4) murder committed by one who was, at the time of commission of the murder, under sentence of life imprisonment; (5) murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety; (6) the illegal sale, for gain, of cocaine, heroin or methadone to a person who dies as a direct result of the use by him of such cocaine, heroin or methadone, provided such seller was not, at the time of such sale, a drug-dependent person; (7) murder committed in the course of the commission of sexual assault in the first degree; (8) murder of two or more persons at the same time or in the course of a single transaction."

[4] General Statutes (Rev. to 1983) § 53a-71 provides in part: "SEXUAL ASSAULT IN THE SECOND DEGREE: CLASS C FELONY: NINE MONTHS NOT SUSPENDABLE. (a) A person is guilty of sexual assault in the second degree when such person engages in sexual intercourse with another person and such other person is (1) under fifteen years of age, or (2) mentally defective, mentally incapacitated or physically helpless, or (3) less than eighteen years old and the actor is such person's guardian or otherwise responsible for the general supervision of such person's welfare, or (4) such other person is in custody of law or detained in a hospital or other institution and the actor has supervisory and disciplinary authority over such other person.

"(b) Sexual assault in the second degree is a class C felony for which nine months of the sentence imposed may not be suspended or reduced by the court."

in Norwich. Christine and her three year old daughter, Amy Russell, normally slept in one bedroom, while Mary slept in the other. During May and early June, Mary had dated and had sexual relations with the defendant, but approximately one week before the day of the murders she had broken up with him. On the afternoon of June 15, she had spoken to the defendant on the phone, telling him she would call him later. Soon thereafter, she went out on a date from which she returned in the early morning hours. At approximately 1 a.m., the defendant, looking for Mary, arrived at the apartment. Having been admitted by Christine, the defendant refused to comply with her request that he leave. An argument and then a physical struggle ensued. Christine broke away and ran into her bedroom, where the defendant followed her. He pulled out a knife, which he had concealed in his sock, and stabbed her several times in the chest. She fell on the bed while he continued to stab her. Amy awoke screaming, "Mommy, Mommy." The defendant grabbed the child by the neck in an attempt to strangle her and then slit her throat. Upon hearing gurgling noises from Christine, he removed her panties and had sexual intercourse with her, stabbing her again afterwards. He then proceeded to remove and destroy evidence linking him with the crimes.

At the penalty stage, the state presented essentially the same evidence to the jury as it had earlier presented to the court. The defendant in turn presented evidence of his deprived home life and mental impairment. According to the defendant's mother, the defendant had grown up in a family atmosphere marked by violence and tragedy. She testified that during his childhood, the defendant had suffered numerous head injuries, had been beaten regularly by his father, who had often been drunk, and had witnessed numerous acts of violence perpetrated by his father on his mother.

According to Charles Opsahl, a psychologist, the defendant's childhood difficulties were reflected in current test results that showed his strong depression and his heightened sensitivity to rejection by others. The defendant also presented the testimony of James Merikangus, a psychiatrist, who concluded, after an examination of the defendant, that he suffered from organic brain dysfunction. In addition, the defendant introduced evidence that he had been drinking excessively on the night of the murders and that he had a tendency to get out of control when drinking. On rebuttal, the state called another psychiatrist, Robert Miller, who disagreed with Merikangus' conclusions and diagnosed the defendant as having a mixed personality disorder with antisocial and explosive tendencies.

At the close of the evidence, the court submitted two questions to the jury for its special verdict: whether the state had proved beyond a reasonable doubt the existence of an aggravating factor and whether the defendant had proved by a preponderance of the evidence the existence of a mitigating factor. Despite an extended period of deliberations, and the court's giving of a "Chip Smith" charge,[5] the jury was unable to reach unanimous agreement on the second of these questions. Upon the court's instruction, the jury handed in its special verdict forms, which indicated that the state had proved the existence of an aggravating factor and that the jury was divided equally as to whether the defendant had proved the existence of a mitigating factor. The court discharged the jury and subsequently sentenced the defendant to a term of life imprisonment on the murder count, another term of life imprisonment on the capital felony count and ten years imprisonment on the sexual assault count. Because the defendant and the state disagreed as to whether sentencing should be done by the original three

[5] See *State* v. *Smith,* 49 Conn. 376, 386 (1881).

judge court or the court presiding over the penalty hearing, *Edelberg, J.,* both imposed sentence.[6]

Both the state and the defendant appeal. The state raises three claims of error: It argues that the trial court erred in: (1) refusing to impose the death sentence when the jury failed unanimously to find the existence of a mitigating factor; (2) failing to declare a mistrial when the jury's disagreement became manifest; and (3) precluding the state from examining Opsahl's notes, which the court had earlier ordered sealed. The defendant claims that the trial court violated his constitutional and common law right not to be placed in jeopardy twice for the same offense when it sentenced him both for murder and for capital felony.

With regard to the state's appeal, we first hold that the trial court did not err in failing to impose the death penalty. Second, we conclude that principles of double jeopardy may preclude our consideration of the state's claim that the trial court should have declared a mistrial. Accordingly, we remand for the trial court to articulate its reasons for having imposed a life sentence. We do not at this juncture consider the further claims raised by the state or the defendant.

## II

This case presents important questions of first impression concerning the scope and meaning of our

---

[6] Prior to either the guilt or penalty phases of the trial in this case, extensive pretrial proceedings were held before the trial court, *Hendel, J.* During pretrial proceedings, the state moved, apparently on the basis of General Statutes (Rev. to 1983) § 53a-45 (b), for a determination that the three judge panel must preside over the sentencing hearing. The trial court, *Hendel, J.,* denied the motion. The merits of this ruling are not before us on this appeal. The trial court, *Edelberg, J.,* presided over the sentencing hearing. On the day the jury was discharged, the state renewed its claim that a three judge panel must sentence the defendant. The trial court, *Edelberg, J.,* denied the motion, but agreed to submit the question to the entire panel. The record reveals that the entire panel was subsequently convened and, after hearing further argument from the state and the defendant, rendered a unanimous decision both in imposing consecutive life sentences and in denying the motion for mistrial.

death penalty statute. Enacted in 1973, General Statutes (Rev. to 1983) § 53a-46a[7] has not, until now, been the focus of an appeal to this court. The statute sets forth both substantive and procedural guidelines for imposing the death penalty on a person who has committed a capital felony. The crux of the statute, and of the state's appeal, is § 53a-46a (e), which mandates either a death sentence or a term of life imprisonment if certain special findings are made by the trier of fact: "If the jury or, if there is no jury, the court finds that one or more of the [aggravating] factors set forth in subsection (g) exists and that no mitigating factors exist, the court shall sentence the defendant to death. If the jury or, if there is no jury, the court finds that none of the [aggravating] factors set forth in subsection (g) exists or that one or more mitigating factors exist, the court shall impose a [life] sentence in accordance with subdivision (1) of section § 53a-35a."

In order to apply the statute to the facts of this case, we must resolve three issues. First, what standard of proof governs the statutory direction to the trier of fact to determine the existence of aggravating and mitigating factors? Second, what directions does the statute give in the event that the trier of fact cannot reach a unanimous determination on the existence of any mitigating factor? Third, what are the constitutional limitations on the reviewability of a trial court's decision not to grant a motion for mistrial when a jury is unable to reach a unanimous decision on the existence of aggravating or mitigating factors?

---

[7] This case was prosecuted under the law in effect in July, 1984, when the crime occurred. The death penalty statute was amended in 1985 by Public Acts 1985, No. 85-366, entitled "An Act Concerning the Death Penalty." This act provides a definition of "mitigating factor" and establishes a two-step process for determining whether a nonstatutory mitigating factor exists. The act also changes the definition of life imprisonment, where the sentence is imposed pursuant to § 53a-46a (f), from a definite term of sixty years to the remainder of one's natural life, for crimes committed after the effective date of the act.

## A

We begin our discussion of the proper construction of § 53a-46a (e) with a general description of the way the statute operates. In order to avoid the constitutional defect of a statutory authorization of a death penalty without an individualized determination of its propriety in a given case; see *Woodson* v. *South Carolina,* 428 U.S. 280, 303–305, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976); Connecticut has enacted a "guided discretion" death penalty statute that channels the sentencer's discretion through fixed criteria for consideration. See J. Greenberg, "Capital Punishment as a System," 91 Yale L.J. 908, 915–16 (1982). The United States Supreme Court has upheld the concept of "guided discretion" death penalty laws in *Gregg* v. *Georgia,* 428 U.S. 153, 189–95, 96 S. Ct. 2909, 49 L. Ed. 2d 859, reh. denied, 429 U.S. 875, 97 S. Ct. 197, 50 L. Ed. 2d 158 (1976).[8]

A person convicted of a capital felony risks the death penalty "only if a hearing is held in accordance with the provisions" of General Statutes § 53a-46a. The primary purpose of this adversarial hearing[9] is to elicit from the trier of fact "a special verdict setting forth its findings as to the existence of any aggravating or mitigating factor." General Statutes § 53a-46a (d). The court's exercise of its statutory mandate under § 53a-46a (e) to sentence the defendant to death or to life imprisonment is predicated upon the trier's resolution of these two distinct questions of fact.

---

[8] This case presents no constitutional challenge, on state or federal grounds, to the Connecticut death penalty law.

[9] In General Statutes § 53a-46a (c), the death penalty statute establishes broad evidentiary rules to assist the trier of fact in determining whether aggravating or mitigating factors exist. A capital defendant may offer information relevant to any mitigating factor "regardless of its admissibility" under ordinary evidentiary rules, even though the state's proof of aggravating factors is governed by the rules of evidence in trials of criminal mat-

The trier must first find whether any of the aggravating factors set forth in § 53a-46a (g) exists. Although the statute expressly imposes on the state the burden of establishing any of the six statutorily defined aggravating factors in accordance with the established rules of admissibility in trials of criminal matters; General Statutes § 53a-46a (c); it fails to specify the standard by which the state must prove its case. Our determination of the appropriate standard is guided by the principle that "the choice of the standard for a particular variety of adjudication . . . reflect[s] a very fundamental assessment of the comparative social costs of erroneous factual determinations." *In re Winship,* 397 U.S. 358, 370, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) (Harlan, J., concurring). The vast majority of death penalty laws in this country require the state to prove the existence of an aggravating factor beyond a reasonable doubt. See S. Gillers, "Deciding Who Dies," 129 U. Pa. L. Rev. 1, 21 n.100 (1980). Requiring this level of proof "conveys to a decision maker a sense of the solemnity of the task and of the necessity for a high degree of certitude . . . in imposing the death sentence." *State* v. *Wood,* 648 P.2d 71, 84 (Utah 1982). Given the highly significant consequences of erroneous factual determinations in capital cases, we conclude that an aggravating factor must be established by the state beyond a reasonable doubt.

If an aggravating factor exists, the trier must then decide the second question, whether a mitigating fac-

ters. See *Eddings* v. *Oklahoma,* 455 U.S. 104, 113-16, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982) (any aspect of defendant's character or record must be open to consideration as mitigating circumstance). Full disclosure to the defendant of all material contained in any presentence report is also required. See *Gardner* v. *Florida,* 430 U.S. 349, 357-62, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977) (due process is violated when death penalty is imposed in part on basis of presentence report that defendant had no opportunity to deny or explain). Both the state and the defendant are to be afforded "fair opportunity to present argument as to the adequacy of the information to establish the existence of any mitigating or aggravating factor."

tor exists. The statute provides that "[t]he burden of establishing any mitigating factor shall be on the defendant." General Statutes § 53a-46a (c). Here again, however, the statute fails to supply a standard by which the defendant can meet this burden of persuasion. Analogous principles of criminal law persuade us that this statutory lacuna should be filled by requiring the defendant to establish the existence of a mitigating factor by a preponderance of the evidence.

The statutory treatment of affirmative defenses provides a useful analogy because the defendant bears the burden of persuasion for affirmative defenses; General Statutes § 53a-12 (b); just as he does for mitigating factors under the death penalty statute. General Statutes § 53a-46a (c). When a defense "declared to be an affirmative defense" is raised at trial, the defendant has the burden of persuasion by a preponderance of the evidence. General Statutes § 53a-12 (b). The intrinsic appeal of this analogy is strengthened by the recognition that an affirmative defense may operate in a manner closely akin to that envisaged by the death penalty statute. If a defendant who has been charged with the crime of murder succeeds in establishing, by a preponderance of the evidence, the affirmative defense of extreme emotional disturbance, he may be convicted of manslaughter but not of murder. General Statutes § 53a-54a (a); *State* v. *Asherman,* 193 Conn. 695, 731, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). "[T]he defense of extreme emotional disturbance does not serve to negate intent, but rather is raised to establish *circumstances that mitigate culpability."* (Emphasis added.) *State* v. *Elliott,* 177 Conn. 1, 6, 411 A.2d 3 (1979); see also H. Wechsler, "Codification of Criminal Law in the United States: The Model Penal Code," 68 Colum. L. Rev. 1425, 1446 (1968). Similarly, a defendant at a capital sentencing hearing, by establishing a mitigating fac-

tor, does not escape criminal liability altogether, but only succeeds in obtaining a more lenient sentence.[10]

## B

Having laid out the basic features of our death penalty law, we turn to the first facet of the controversy at hand: the proper interpretation of § 53a-46a (e) in a case in which a jury, having found the existence of an aggravating factor, is unable to make a unanimous finding regarding the existence of a mitigating factor. The state makes a two-part claim in support of its argument that these circumstances mandate the imposition of the death penalty. The state maintains that, once it has established the existence of an aggravating factor, a defendant can escape the death penalty only by persuading the trier of fact that a mitigating factor exists. Further, according to the state, this defendant has failed to meet his burden of persuasion. As the state would have us construe § 53a-46a (e), a death sentence is mandated in this case because the jury found an aggravating factor but no mitigating factor.

The defendant espouses a diametrically opposite construction of the statute. According to him, the statute does not authorize the imposition of a death sentence unless there has been an unconditional and unanimous finding by the trier of fact that "no mitigating factors exist" within the meaning of § 53a-46a (e). Absent a finding that "no mitigating factors exist," he urges us to conclude that there is no statutory foundation for

---

[10] Although not in effect for this case, Public Acts 1985, No. 85-366, codified at General Statutes (Rev. to 1987) §§ 53a-35b and 53a-46a (d) provides a useful definition of mitigating factors: "Mitigating factors are such as do not constitute a defense or excuse for the capital felony of which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death." General Statutes § 53a-46a (d).

a death sentence. In contrast to the state's construction, the defendant's interpretation puts the focus of § 53a-46a (e) on the nonexistence, rather than the existence, of mitigating factors.

Before we reach the merits of these arguments, we pause to note that this issue is properly here, even though the state is seeking, on its appeal, to impose a penalty upon the defendant that is more severe than that ordered by the trial court. The defendant argues that double jeopardy bars the imposition of the death sentence because he has already begun execution of a life sentence. We do not agree. Both the trial court and this court, on appeal, have the power, at any time, to correct a sentence that is illegal. Practice Book § 935. The classic type of illegal sentence is one that is below the mandatory minimum. *Bozza* v. *United States,* 330 U.S. 160, 166–67, 67 S. Ct. 645, 91 L. Ed. 818 (1947). It is the state's claim here that any sentence less than death falls below the minimum mandated by the law. Consequently, if the state were to prevail on the merits of its argument, it would follow that the trial court acted illegally in imposing a life sentence. Correction of this illegality, were it to be shown, would not violate double jeopardy. *United States* v. *Fogel,* 829 F.2d 77, 83 (D.C. Cir. 1987); *State* v. *Nardini,* 187 Conn. 109, 116, 445 A.2d 304 (1982); *State* v. *Pina,* 185 Conn. 473, 479, 440 A.2d 962 (1981); see *United States* v. *DiFrancesco,* 449 U.S. 117, 101 S. Ct. 426, 66 L. Ed. 2d 328 (1980).[11]

Turning to the merits, however, we are not persuaded by the state's view that a jury finding that it is unable to agree as to the existence of a mitigating factor is the functional equivalent of a jury finding that "no mitigating factors exist." Concededly, the record contains no such unanimous finding, but reflects instead

[11] We note in addition that the state's first claim does not implicate the double jeopardy prohibition against multiple proceedings. See *United States* v. *Martin Linen Supply Co.,* 430 U.S. 564, 569–70, 97 S. Ct. 1349, 51 L. Ed. 2d 642 (1977).

an evenly split panel of twelve jurors who were unable to agree on whether the defendant had met his burden of proof. The state construes the deadlocked jury vote as a finding that the defendant did not prove that a mitigating factor exists. According to the state, such a finding, coupled with the undisputed existence of an aggravant, mandates a death sentence under § 53a-46a (e). We disagree. We conclude instead that a jury verdict in the penalty phase of a capital case must comport with the guidelines that govern the validity of jury verdicts generally, including the requirement of unanimity. Because the jury in this case was unable to reach a unanimous verdict, there is no finding, one way or the other, on whether the defendant met his burden of proof. The record therefore fails to sustain the state's claim.

It is settled doctrine in Connecticut that a valid jury verdict in a criminal case must be unanimous. Practice Book § 867; *State* v. *Stankowski,* 184 Conn. 121, 147, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981); *State* v. *Gannon,* 75 Conn. 206, 229–30, 52 A. 727 (1902). A nonunanimous jury therefore cannot render any "finding" of fact. The state argues nonetheless that a penalty phase jury in a capital case, because of its sui generis factfinding function, is not subject to this general rule. Two principal reasons compel us to disagree with the state.

We first are persuaded that the functions performed by guilt and penalty phase juries are sufficiently similar so as to warrant the application of the unanimimous verdict rule to the latter. Each jury receives evidence at an adversarial hearing where the chief engine of truth-seeking, the power to cross-examine witnesses, is fully present. At the close of the evidence, each jury is instructed on the law by the court. Finally, in returning a verdict, each jury has the power to "acquit": in the guilt phase, of criminal liability, and in the penalty phase, of the death sentence.

Second, we perceive a special need for jury unanimity in capital sentencing. Under ordinary circumstances, the requirement of unanimity induces a jury to deliberate thoroughly and helps to assure the reliability of the ultimate verdict. A. Spinella, Connecticut Criminal Procedure (1985) pp. 690–92. The "heightened reliability demanded by the Eighth Amendment in the determination whether the death penalty is appropriate"; *Sumner* v. *Shuman,* 483 U.S. 66, 72, 107 S. Ct. 2716, 97 L. Ed. 2d 56 (1987); convinces us that jury unanimity is an especially important safeguard at a capital sentencing hearing. In its death penalty decisions since the mid-1970s, the United States Supreme Court has emphasized the importance of ensuring reliable and informed judgments. *Beck* v. *Alabama,* 447 U.S. 625, 637–39, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980); *Lockett* v. *Ohio,* 438 U.S. 586, 604–605, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978); *Gardner* v. *Florida,* 430 U.S. 349, 359–60, 99 S. Ct. 1197, 51 L. Ed. 2d 393 (1977); *Woodson* v. *North Carolina,* supra, 304–306. These cases stand for the general proposition that the "reliability" of death sentences depends on adhering to guided procedures that promote a reasoned judgment by the trier of fact. The requirement of a unanimous verdict can only assist the capital sentencing jury in reaching such a reasoned decision.

Applying the unanimity requirement to this case, we conclude that the record is insufficient to warrant imposition of the death penalty. On its special verdict form, the jury did not find, by unanimous vote, that the defendant had failed to prove by a preponderance of the evidence that a mitigating factor exists. Accordingly, a crucial finding that would have triggered the death penalty was absent. We reject the state's assertion that correcting the verdict form at this stage is a purely ministerial act. This court has neither the authority nor the inclination to arrogate to itself such factfinding. The trial court was therefore correct in not sentencing the defendant to death.

We are equally unpersuaded by the defendant's view that a jury that is unable to agree is the functional equivalent of a jury that has found that "mitigating factors exist," so that imposition of the death sentence was statutorily precluded. The defendant would have us read § 53a-46a (e) syllogistically: the death penalty requires a finding that aggravating facts exist and that "no mitigating factors exist"; in this case, there has not been a finding that "no mitigating factors exist"; ergo, the death penalty is impermissible. The practical consequence of reading the statute so as to give dispositive effect to the absence of a definitive finding about mitigating factors would be that the state would bear the burden of proving a negative, i.e., the nonexistence of mitigating factors.

We agree with the state that the defendant's proffered construction of § 53a-46a (e) would make the statute unworkable, and therefore should be rejected. *State* v. *Ellis,* 197 Conn. 436, 445, 497 A.2d 974 (1985). The overriding objective at a sentencing hearing under § 53a-46a is to determine whether mitigating or aggravating factors *exist.* In § 53a-46a (b), which provides for a capital sentencing hearing, the statute directs an inquiry into "the existence of any mitigating factor . . . and any aggravating factor" authorized by law. A sentencing hearing may be waived if the state stipulates that "none of the aggravating factors . . . exists or that one or more mitigating factors exists." General Statutes § 53a-46a (b). In § 53a-46a (c), the statute prevents the use of information in a presentence report withheld from the defendant "in determining the existence of any mitigating or aggravating factor." The statute puts the "burden of establishing" aggravating and mitigating factors on the state and the defendant respectively. General Statutes § 53a-46a (c). In returning its special verdict, the jury must set forth its "findings as to the existence of any aggravating or mitigating factor." General Statutes § 53a-46a (d).

The construction proffered by the defendant, with its requirement that the absence of mitigating factors be proven, is therefore inconsistent with the overall pattern of the statute. We have recognized the "difficulty created when any party is given the burden of proving the nonexistence" of a disputed fact. *State* v. *Januszewski,* 182 Conn. 142, 167, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981). Read in its entirety, our death penalty law evinces no intent to impose so difficult a burden on the state. *Shelby Mutual Ins. Co.* v. *Della Ghelfa,* 200 Conn. 630, 637, 513 A.2d 52 (1986); *Norwich* v. *Silverberg,* 200 Conn. 367, 371, 511 A.2d 336 (1986).

The defendant's syllogistic construction is also inconsistent with the manner in which the statute allocates burdens of proof. If, as we have determined, the defendant bears the burden of establishing a mitigating factor by a preponderance of the evidence, it does not make sense to leave the state, in practical effect, with the burden of establishing the nonexistence of a mitigating factor. The death penalty may not be imposed if the trier finds "by a special verdict . . . that any mitigating factor *exists.*" (Emphasis added.) General Statutes § 53a-46a (f). The defendant, in his quest to avoid the death penalty, could hardly be expected to offer proof on the *non*existence of the very factor that would save his life. Presumably, then, the state would bear the ultimate burden of persuading the jury that all mitigating factors are absent from the case. The unworkable nature of such a burden was aptly summarized by the Maryland Court of Appeals: "Generally a defendant in a capital sentencing proceeding will have a greater knowledge concerning the presence or absence of mitigating circumstances than the State. Moreover, because of the virtually unlimited scope of what may be deemed by the jury to be a mitigating circumstance . . . it would be unreasonable to insist that

the State establish the absence of such mitigating factors." *Foster* v. *State,* 304 Md. 439, 476, 499 A.2d 1236 (1985), cert. denied, 478 U.S. 1010, 106 S. Ct. 3310, 92 L. Ed. 2d 723 (1986).

We therefore agree with the state that the defendant's construction of the statute is unreasonable. The phrase "no mitigating factor exists" expresses the requirement that the defendant prove by a preponderance of the evidence the existence of a mitigating factor. A unanimous jury verdict that the defendant has not met this burden of proof is equivalent to a finding that "no mitigating factor exists" within the meaning of § 53a-46a (e).

Although we reject the defendant's construction of § 53a-46a (e), we must consider his further claim that General Statutes (Rev. to 1983) § 53a-35a (1) absolutely mandates a life sentence at the close of any capital sentencing hearing that fails to yield a death sentence. That statute provides that a person who commits a capital felony shall be sentenced to "a term of life unless a sentence of death is imposed in accordance with section 53a-46a." Standing alone, that statute might arguably create a mandatory minimum sentence for the crime of capital felony whenever, and for whatever reason, the death penalty is not imposed, as the defendant argues.

Our appraisal of the significance of § 53a-35a (1) cannot, however, occur in a vacuum. *Peck* v. *Jacquemin,* 196 Conn. 53, 72, 491 A.2d 1043 (1985). We must reconcile its apparent thrust with conflicting language in the death penalty statute itself. General Statutes § 53a-46a (e) provides that if the trier "finds that none of the [aggravating] factors set forth in subsection (g) exists or that one or more mitigating factors exist, the court shall impose a sentence" in accordance with § 53a-35a (1). This language requires the imposition of

a life sentence only when the trier of fact has either not found the existence of an aggravant or found the existence of a mitigant. Only if the language of § 53a-35a (1) overrides this specific direction can the defendant succeed in his claim that a life sentence is mandated by law in this case.

We conclude that the specific provision of § 53a-46a (e) prevails over the more general language of § 53a-35a (1). A statutory provision that articulates with greater specificity the resolution of a particular controversy is presumed to prevail over a more general provision. *State* v. *Torres,* 206 Conn. 346, 359, 538 A.2d 185 (1988); *McKinley* v. *Musshorn,* 185 Conn. 616, 623–24, 441 A.2d 600 (1981). This rule is especially apt in this case. Section 53a-35a (1) only states that the penalty for a capital offense is a life sentence unless the death penalty is imposed. The detailed language of § 53a-46a (e), on the other hand, delineates the specific factual circumstances under which life imprisonment must be imposed. Because the record in this case reveals an unchallenged finding that an aggravating factor exists, but no unanimous finding that the defendant has proved that a mitigating factor exists, the defendant was not entitled as a matter of law to a sentence of life imprisonment on his conviction for capital felony.

In reaching this result, we freely acknowledge that our construction of § 53a-46a places Connecticut alongside a very small minority of jurisdictions with regard to the proper procedure to be followed when the jury cannot unanimously agree. The majority of states have statutorily provided for an automatic sentence of less than death in the event of a deadlocked jury. See, e.g., S. Gillers, "Deciding Who Dies," 129 U. Pa. L. Rev. 1, 102–19 (1980); see *Hill* v. *State,* 250 Ga. 821, 301

S.E.2d 269 (1983). Whether our decision today calls for corrective action is a matter that only the legislature can decide.

We thus conclude, contrary to the arguments of both the state and the defendant, that § 53a-46a (e) does not mandate a determinate outcome for death penalty cases in which a trier of fact cannot come to a unanimous finding about the existence of mitigating factors. In such circumstances, the statute neither authorizes imposition of the death penalty nor requires the imposition of a life sentence. Lest any misperception occur, our holding is that the imposition of the death penalty under § 53a-46a (e) must be premised on two unanimous findings by the trier of fact: that the state has proved beyond a reasonable doubt that an aggravating factor exists and that the defendant has not proved by a preponderance of the evidence that a mitigating factor exists. A unanimous jury verdict that the defendant did not prove that a mitigating factor exists fulfills the statutory requirement that the death penalty not be imposed unless "no mitigating factors exist" within the meaning of § 53a-46a (e).

## C

Having determined that on the present record neither a death sentence nor a life sentence is mandated, we turn to consider whether the presiding judge at a capital sentencing hearing has the authority to declare a mistrial. We reject the defendant's claim that he does not. Faced with a jury that is unable to agree unanimously on its findings, the trial court may, in the exercise of its discretion, grant a motion for mistrial by either party.[12] Practice Book § 889 provides in full:

---

[12] A mistrial may be declared over the protest of a criminal defendant when there is "manifest necessity" to abort the trial short of judgment. The manifest necessity test has its origin in *United States* v. *Perez*, 22 U.S. (9 Wheat.) 579, 580, 6 L. Ed. 165 (1824), which ordered a retrial after the

"[PROCEEDINGS AT TRIAL—MISTRIAL]——JURY'S INA-BILITY TO REACH VERDICT. The judicial authority shall declare a mistrial in any case in which the jury are [sic] unable to reach a verdict." The defendant argues that § 889 is limited, by the express language of its title, to the context of a "trial," which Practice Book § 1021 (11) defines as "that judicial proceeding at which the *guilt or innocence* of the defendant . . . is to be determined." (Emphasis added.) The defendant, however, overlooks the prefatory clause of § 1021, which states that its definition of "trial" controls "[u]nless the context clearly requires otherwise." The context of capital sentencing "clearly requires otherwise." A trial

initial case was dismissed because of a hung jury. Because the defendant, however, has a "valued right to have his trial completed by a particular tribunal"; *Wade* v. *Hunter,* 336 U.S. 684, 689, 69 S. Ct. 834, 93 L. Ed. 974 (1949); a mistrial is appropriate only if there is a "high degree" of necessity. *Arizona* v. *Washington,* 434 U.S. 497, 506, 98 S. Ct. 824, 54 L. Ed. 2d 717 (1978). Of the potential grounds for mistrial under the rubric of manifest necessity, a deadlocked jury has been regarded as convincing. *Downum* v. *United States,* 372 U.S. 734, 735–36, 83 S. Ct. 1033, 10 L. Ed. 2d 100 (1963); *Aillon* v. *Manson,* 201 Conn. 675, 681 n.5, 519 A.2d 35 (1986); *State* v. *Roy,* 182 Conn. 382, 286, 438 A.2d 128 (1980).

Whether "manifest necessity" exists is a question for the trial court to resolve in light of the totality of circumstances. A variety of factors may be considered, including " '(1) a timely objection by defendant, (2) the jury's collective opinion that it cannot agree, (3) the length of the deliberations of the jury, (4) the length of the trial, (5) the complexity of the issues presented to the jury, (6) any proper communications which the judge has had with the jury, and (7) the effects of possible exhaustion and the impact which coercion of further deliberations might have on the verdict.' " *State* v. *Aillon,* 182 Conn. 124, 133 n.7, 438 A.2d 30 (1980), cert. denied, 449 U.S. 1090, 101 S. Ct. 883, 66 L. Ed. 2d 817 (1981), quoting *Arnold* v. *McCarthy,* 566 F.2d 1377, 1387 (9th Cir. 1978). On review on appeal, the trial court's assessment of the necessity for a mistrial is accorded great deference. *State* v. *Aillon,* supra, 130 n.4.

In addition to manifest necessity, a mistrial can be granted at the defendant's request or with his consent. Id., 131 n.6. Reprosecution after this type of mistrial is "barred only when prosecutorial or judicial overreaching is designed to provoke the defendant into asking for a mistrial . . . or the prosecutorial or judicial error was otherwise motivated by bad faith or attempted in order to harass or prejudice the defendant." Id., 130.

court must have the power to declare a mistrial to avoid "a significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors." *Arizona* v. *Washington,* supra, 509. In addition, our earlier conclusion that, for purposes of jury unanimity, penalty and guilt phase juries perform like functions supports a determination that the mistrial provisions of the Practice Book apply in both contexts.

Concomitant with the trial court's discretionary power to declare a mistrial is its authority to enter a judgment "acquitting" the defendant of the death penalty. Practice Book § 883 provides that upon motion by the defendant or by the court sua sponte "the judicial authority shall order the entry of a judgment of acquittal . . . [if] the evidence would not reasonably permit a finding of guilty." In the trial of ordinary criminal cases, the power to order an acquittal is an important safeguard against irrational and unsupported jury verdicts. *United States* v. *Ubl,* 472 F. Sup. 1236, 1237 (N.D. Ohio 1979); *United States* v. *Melillo,* 275 F. Sup. 314, 318 (E.D.N.Y. 1967); 2 C. Wright, Federal Practice and Procedure (1982) § 461, pp. 637–38; A. Spinella, Connecticut Criminal Procedure (1985) p. 708. As a device for controlling the discretion of the jury, the power to acquit is particularly important in the context of capital sentencing. If, on the basis of the evidence adduced at the entire hearing, the jury could not reasonably fail to find that a mitigating factor exists or that no aggravating factor exists, the trial court may direct appropriate findings, thereby "acquitting" the defendant of the death penalty. See *State* v. *Stankowski,* supra, 126. Alternatively, the court may, in the interest of fairness, exercise its discretion not to enter a mistrial even if it determines that "acquittal" is inappropriate. Such an exercise of discretion is

reviewable on appeal in the event of its abuse. See General Statutes § 54-56; *State* v. *Corchado,* 200 Conn. 453, 458-59, 512 A.2d 183 (1986).

## D

The state claims that the trial court erred in denying its motion for a mistrial in light of the deadlocked jury. Before this claim can be addressed on its merits, however, a threshold issue must be decided: If we were to find error and remand the case for a second sentencing hearing, would the prohibition against double jeopardy prevent the state from instituting new proceedings? Under the double jeopardy clause of the fifth amendment to the United States constitution, the state may not subject to retrial a defendant who has been acquitted of the crime charged. *Bullington* v. *Missouri,* 451 U.S. 430, 437-38, 101 S. Ct. 1852, 68 L. Ed. 2d 270 (1981); *State* v. *Southard,* 191 Conn. 506, 510-11, 467 A.2d 920 (1983). "When a successful postacquittal appeal by the prosecution would lead to proceedings that violate the Double Jeopardy Clause, the appeal itself has no proper purpose. Allowing such an appeal would frustrate the interest of the accused in having an end to the proceedings against him." *Smalis* v. *Pennsylvania,* 476 U.S. 140, 145, 106 S. Ct. 1745, 90 L. Ed. 2d 116 (1986). If the trial court's imposition of a life sentence constituted an "acquittal on the merits" of the death sentence, then the double jeopardy clause bars a second capital sentencing hearing. If, however, its judgment was premised on the erroneous belief that it had no authority to declare a mistrial, a different result would follow.

The United States Supreme Court first held that the double jeopardy prohibition against multiple trials applied to capital sentencing proceedings in *Bullington* v. *Missouri,* supra. Under *Bullington* and its progeny, our inquiry must proceed in two stages. First, we must

determine whether the Connecticut death sentencing scheme is sufficiently similar to a trial on the question of guilt or innocence that principles of double jeopardy apply. See *Arizona* v. *Rumsey,* 467 U.S. 203, 211, 104 S. Ct. 2305, 81 L. Ed. 2d 164 (1984); *Bullington* v. *Missouri,* supra, 437–42. Second, we must examine the reasoning underlying the trial court's decision to impose a life sentence in order to determine whether that decision constituted "an acquittal on the merits" of the death penalty. See *Poland* v. *Arizona,* 476 U.S. 147, 153–54, 106 S. Ct. 1749, 90 L. Ed. 2d 123 (1986); *Arizona* v. *Rumsey,* supra; *Bullington* v. *Missouri,* supra, 444–45. With regard to this latter issue, the United States Supreme Court has emphasized that the fact that in imposing a life sentence the trial court had relied on an error of law "does not change the double jeopardy effects of a judgment that amounts to an acquittal on the merits." *Arizona* v. *Rumsey,* supra. If the trial court's imposition of a life sentence amounts to an "acquittal" of the death penalty then double jeopardy bars a second capital sentencing proceeding.

In its examination of the Missouri scheme in *Bullington,* the United States Supreme Court identified several characteristics that the death sentencing hearing shared with a trial: "The jury . . . was not given unbounded discretion to select an appropriate punishment from a wide range authorized by statute. Rather, a separate hearing was required and was held, and the jury was presented both a choice between two alternatives and standards to guide the making of that choice. Nor did the prosecution simply recommend what it felt to be an appropriate punishment. It undertook the burden of establishing certain facts beyond a reasonable doubt in its quest to obtain the harsher of the two alternative verdicts." *Bullington* v. *Missouri,* supra, 438; accord *Arizona* v. *Rumsey,* supra, 209–10. The Connecticut scheme bears these same characteris-

tics. As we noted earlier, § 53a-46a requires a separate penalty phase hearing at which the jury, guided by substantive and procedural standards, must return a special verdict in which it indicates whether aggravating or mitigating factors have been established. Depending on the findings that are made, the trial court is required to impose either a life sentence or the death penalty, unless the special verdict is for some reason subject to being set aside. In order to support a sentence of death, the state must prove an aggravating factor, as defined by statute, beyond a reasonable doubt. Thus our earlier conclusion that the sentencing hearing under § 53a-46a was equivalent to a trial for the purposes of the requirement of jury unanimity and the trial court's authority to declare a mistrial applies with equal force with regard to the double jeopardy prohibition against multiple prosecutions.

Because double jeopardy principles apply to proceedings under § 53a-46a, we must next examine the record to determine whether the trial court, in sentencing the defendant to life imprisonment, in effect acquitted the defendant of the death penalty. Outside the context of death penalty hearings, the United States Supreme Court has characterized the dispositive question as "whether the ruling of the judge, whatever its label, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged." *United States* v. *Martin Linen Supply Co.,* 430 U.S. 564, 571, 97 S. Ct. 1349, 51 L. Ed. 2d 642 (1977). The fact that an "acquittal" is based in whole or in part on an erroneous construction of the governing law is of no import. That fact " 'affects the accuracy of that determination, but it does not alter its essential character.' " *Arizona* v. *Rumsey,* supra, 211, quoting *United States* v. *Scott,* 437 U.S. 82, 98, 98 S. Ct. 2187, 57 L. Ed. 2d 65, reh. denied, 439 U.S. 883, 99 S. Ct. 226, 58 L. Ed. 2d 197 (1978) (Brennan, J., dissenting).

The state contends that the jury's unanimous finding of an aggravating factor precludes a conclusion that the defendant has been "acquitted on the merits," since the jury's finding was in essence a "conviction." We do not agree. The relevant focus in this case is not whether the jury's verdict amounted to an acquittal but whether the trial court's imposition of a life sentence did. For this determination, we must turn to the trial court's reasons for imposing a life sentence.

After discharging the jury, the trial court explained its reasons as follows: "I'm going to make my ruling now with regard to the effect of a hung jury on the mitigating factors issue . . . .

"There is one precedent for this in Connecticut. That is the case of *State* v. *Usry,* [205 Conn. 298, 533 A.2d 212 (1987)], I believe. Judge Corrigan in that situation had interpreted the failure of the jury to agree on mitigating factors to mean, that in effect, he was to sentence the defendant to life. I accept that.

"I also feel that on another basis that I am right in doing this. The wisdom of the Bar seems to have been, in the past, before the first of these three cases came up, that in no way would anybody ever be able to get a death penalty because of the way our death penalty statute has been written. I have learned that firsthand, how this process works.

"I am now convinced that we have a death penalty in name only. We do not have a viable death penalty statute.

"I feel that the State *had its best shot* at this trial; and, with all of that, there was a division of six and six.

"I see no further reason to prolong the Daniels sentencing phase of the trial any further. That is my second reason for finding the way I have.

"I am confident now that there is no way anybody is ever going to be sentenced to death based upon the

way our death penalty statute is written today."
(Emphasis added.)

Two days later, prior to sentencing the defendant,
the trial court reiterated its reasons for imposing a life
sentence rather than declaring a mistrial: "With regard
to the mistrial aspect of it, as I indicated Tuesday, I
did agree with the defense as did Judge Corrigan as
to the law on that aspect of it. My colleagues [the two
other judges on the three judge panel], I believe, agree
with me on that. I gratuitously went on to make some
further comment and I did it—I commented about the
death statute itself. I commented about the nonviabil-
ity of it. I have never been a crusader, and at this stage
of my life I don't intend to change my habits. I did it
for a reason. I didn't do it just so that the death pen-
alty statute could be changed. I did it because know-
ing Mr. Satti, and being a consummate prosecutor who
takes to heart the victim's feelings, I was addressing
myself to Mr. Satti and to the victims' family. I wanted
them to know that in no way are they going to get a
death penalty in this particular case, and to put it to
rest and go on with their lives. This case has had two
trials. A third trial will be an exercise in futility. For
that reason I had made these gratuitous remarks on
Tuesday afternoon. Basically, I ruled that way because
I did agree with Judge Corrigan on the precedents that
have been set."

From this record, we conclude that the trial court's
explanation is ambiguous as to whether it was exer-
cising its discretion to impose a life sentence or believed
that it was required to do so as a matter of law. On
the one hand, its comment that "the State *had its best
shot* at trial and with all of that there was a division
of six and six" (emphasis added) suggests that, in decid-
ing to impose a life sentence rather than to declare
a mistrial, it exercised its discretionary factfinding func-
tion. On the other hand, its reference to Judge

Corrigan's decision in *State* v. *Usry* suggests that it may have believed that it did not have discretion to declare a mistrial. The record is thus susceptible to two equally plausible constructions: Under one construction, the trial court, in imposing a life sentence, resolved some of the factual elements underlying the imposition of a life sentence thereby "acquitting" the defendant of the death penalty. Under the other construction, the trial court imposed a life sentence because it erroneously believed that it had no authority to do otherwise. In the former case, principles of double jeopardy would bar review of the state's claim. *United States* v. *Martin Linen Supply Co.,* supra, 571. In the latter case, the appropriate disposition would be to remand to the trial court for it to exercise its discretion to declare a mistrial, to "acquit" the defendant of the death penalty, or to dismiss the death penalty proceeding pursuant to General Statutes § 54-56.

We therefore consider a remand to the trial court to be the appropriate course of action. See *State* v. *Garrison,* 199 Conn. 383, 388–89, 507 A.2d 467 (1986); *State* v. *Ostroski,* 184 Conn. 455, 461, 440 A.2d 166 (1981), cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982). Until these ambiguities are clarified, we need not decide the further claims raised by the state's appeal or the defendant's appeal. On remand, the trial court should articulate its reasons for imposing a life sentence. If the court was in effect "acquitting" the defendant, then further review of the state's appeal is barred because of double jeopardy. This result follows whether the trial court acted for a legally valid reason, pursuant to Practice Book § 883 as discussed in part IC of this opinion, or whether it acted for some other reason. *United States* v. *Martin Linen Supply, Co.,* supra. If the trial court intended to exercise its authority under General Statutes § 54-56 to dismiss the death penalty phase of the proceeding and

refused to grant a mistrial for this reason, it should say so explicitly to provide a basis for review by this court. See *State* v. *Corchado,* supra.

In this opinion the other justices concurred.