Karin APARO, Petitioner,

v.

**SUPERIOR COURT FOR THE JUDICIAL DISTRICT OF HARTFORD/NEW BRITAIN AT HARTFORD, Respondent.**

Civ. No. 3:93CV00579(TFGD).

United States District Court,
D. Connecticut.

June 24, 1996.

Hubert J. Santos, Hope C. Seeley, Santos & Seeley, Hartford, CT, for Karin Aparo.

Judith Rossi Schannon, Judith Rossi, Office of the Chief State's Attorney, Rocky Hill, CT, for Superior Court, Judicial District at Hartford.

## RULING ON PETITION FOR WRIT OF HABEAS CORPUS

DALY, District Judge.

The petitioner, Karin Aparo ("petitioner"), seeks a Writ of Habeas Corpus to bar the State of Connecticut Superior Court ("respondent") from subjecting her to a retrial on a charge of conspiracy to commit murder in the death of her mother, Joyce Aparo ("the petitioner's mother"). For the reasons set forth below, the petition is granted.

## PROCEDURAL HISTORY

On August 28, 1987, the petitioner was arrested and charged in a short form information with the crimes of murder and conspiracy to commit murder in connection with the death of her mother on August 5, 1987. On September 29, 1987, the State of Connecticut (the "State") filed a two-count long-form information charging the petitioner with murder as an accessory in violation of Connecticut General Statutes §§ 53a–8 and 53a–54a(a) and with conspiracy to commit murder in the first degree in violation of Connecticut General Statutes §§ 53a–48(a) and 53a–54a(a). The petitioner pleaded not guilty to both counts.

Prior to trial, on February 19, 1988, the petitioner moved to sever the two counts on the ground that, pursuant to Conn.Gen.Stat. § 54–82b(c), she was entitled to be tried by a jury of six on the conspiracy charge. On April 27, 1990, the trial court denied the petitioner's motion to sever. On June 28, 1990, the jury acquitted the petitioner on the charge of murder as an accessory, but was deadlocked, by a seven to five vote in favor of acquittal, on the charge of conspiracy to commit murder. The trial court, in accordance with Connecticut Practice Book Section 866, declared a mistrial. Thereafter, on July 3, 1990, the petitioner filed a Motion for Acquittal and a Motion in Arrest of Judgment. On February 8, 1991, at oral argument on the motions before the trial court, the parties agreed that the only issue to be decided by the court was the sufficiency of the evidence claim, which was denied by the court in a ruling from the bench. Additionally, by agreement of the parties, the Motion in Arrest of Judgment and the issues relating to double jeopardy and collateral estoppel advanced in the Motion in Arrest of Judgment would be raised before the trial judge at such time as the petitioner was retried on the charge of conspiracy to commit murder.

On July 18, 1990, the State issued a declaration of its intent to retry the petitioner on the charge of conspiracy to commit murder. On May 3, 1991, the petitioner filed a Motion to Dismiss the reprosecution. On November 20, 1991, the trial court denied the motion.

Thereafter, the petitioner filed an interlocutory appeal of the denial of the motion to dismiss in the Connecticut Appellate Court. Subsequently, the Connecticut Supreme Court transferred the matter to its docket. The petitioner presented three arguments before the Supreme Court: 1) that principles of double jeopardy precluded retrial when six

out of twelve jurors voted for acquittal; 2) that principles of collateral estoppel/double jeopardy precluded retrial because the jury necessarily found that she had never intended that her mother be killed; and 3) that principles of collateral estoppel require the exclusion of certain evidence, leaving insufficient admissible evidence to warrant a retrial. *See State v. Aparo*, 223 Conn. 384, 386–87, 614 A.2d 401 (1992). The Supreme Court rejected the first and second claims and accepted the third in part. *Id.* at 387, 614 A.2d 401. The Supreme Court principally held that double jeopardy and collateral estoppel did not bar a retrial but that collateral estoppel did preclude the reuse of certain evidence at the retrial. Both the petitioner and the State filed motions for reargument and reconsideration, which were denied, as were the State's petition and the petitioner's cross-petition for certiorari to the United States Supreme Court. *See Connecticut v. Aparo*, 507 U.S. 972, 113 S.Ct. 1414, 122 L.Ed.2d 785 (1993) and *Aparo v. Connecticut*, 507 U.S. 972, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993). The petitioner subsequently filed the instant petition for a writ of habeas corpus.

## DISCUSSION

The petition raises two grounds for relief: 1) that the principles of collateral estoppel/double jeopardy bar the petitioner's retrial on the conspiracy to commit murder charge because the jury, by its acquittal on the accessory to commit murder charge, necessarily determined an essential element of the crime of conspiracy to commit murder in her favor; and 2) that the principles of double jeopardy and due process bar her retrial on the conspiracy to commit murder charge because the petitioner obtained the necessary number of votes for acquittal at the first trial.

As an initial matter, the State raises two arguments that it asserts bar this Court from considering the instant petition, or parts thereof. First, the State claims that because the petition contains both exhausted and unexhausted claims, the entire petition must be dismissed under *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). Specifically, the State urges that because the

Connecticut Supreme Court reviewed only the double jeopardy/collateral estoppel claims in its opinion disposing of the petitioner's appeal, the petitioner still has an avenue of appeal in the state court on her due process claim and, thus, that claim is not exhausted. This assertion is without merit.

The exhaustion doctrine is designed to give state courts a meaningful opportunity to consider claims of error without interference by the federal courts. *Vasquez v. Hillery*, 474 U.S. 254, 257, 106 S.Ct. 617, 620, 88 L.Ed.2d 598 (1986) (citing *Rose v. Lundy*, 455 U.S. 509, 515, 102 S.Ct. 1198, 1201–02, 71 L.Ed.2d 379 (1982)). "Under standards established by [the Supreme Court], a state prisoner may initiate a federal habeas petition '[o]nly if the state courts have had the first opportunity to hear the claim sought to be vindicated. . . . It follows, of course, that once the federal claim has been fairly *presented* to the state courts, the exhaustion requirement is satisfied." *Id.* (Emphasis added). In the petitioner's brief on appeal before the Connecticut Supreme Court, she specifically raised the due process claim concerning the number of votes necessary for acquittal on the conspiracy charge. *See* Petitioner's March 5, 1992 Brief to the Connecticut Supreme Court, at 47–48. The mere fact that the state court decided, for whatever reason, not to pass on a federal constitutional issue in its written opinion is not determinative of whether the exhaustion doctrine has been satisfied. *See Smith v. Digmon*, 434 U.S. 332, 333, 98 S.Ct. 597, 599, 54 L.Ed.2d 582 (1978) ("[W]hether the exhaustion requirement . . . has been satisfied cannot turn upon whether a state appellate court chooses to ignore in its opinion a federal constitutional claim squarely raised in petitioner's brief in the state court."). Here, the claim was presented to the Connecticut Supreme Court and it had the first crack at reviewing it. Simply because that court did not refer to the due process aspect of that claim in its opinion does not defeat the instant petition. Thus, the exhaustion requirement has been satisfied.

The State next argues that the petitioner failed to raise her claim that the jury necessarily decided that she lacked the intent to

agree with Coleman and that this claim should not be reviewed because it is barred by the cause and prejudice standard enunciated by the Supreme Court in *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). This argument also is without merit. A review of the record on appeal before the Connecticut Supreme Court clearly establishes that this point was briefed by both parties. *See* State's April 29, 1992 Brief to the Connecticut Supreme Court, at 29–30; *see also* Petitioner's May 19, 1992 Reply Brief to the Connecticut Supreme Court, at 11. Accordingly, the Court will consider this claim as well.

## I. *Collateral Estoppel/Double Jeopardy*

The petitioner first claims that the principles of collateral estoppel/double jeopardy bar her retrial on the conspiracy to commit murder charge because the jury, by its acquittal on the accessory to commit murder charge, necessarily determined an essential element of the crime of conspiracy to commit murder in her favor. Specifically, the petitioner argues that the jury, by its acquittal on the accessory to commit murder charge, necessarily found either that she lacked the specific intent that her mother be murdered or that, in view of the trial court's assertedly improper instructions to the jury on the accessory charge, she did not "join" in a conspiracy with Coleman in the commission of the murder. The Court will address these arguments *seriatim.*

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that no "person [shall] be subject for the same offense to be twice put in jeopardy of life or limb." In *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), the Supreme Court held that the Double Jeopardy Clause incorporates the doctrine of collateral estoppel in criminal proceedings. *See also Dowling v. United States*, 493 U.S. 342, 347, 110 S.Ct. 668, 671–72, 107 L.Ed.2d 708 (1990). "Collateral estoppel, or, in modern usage, issue preclusion, 'means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any

future lawsuit.' " *Ashe*, 397 U.S. at 443, 90 S.Ct. at 1194. "Collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' The inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.' " *Id.* at 444, 90 S.Ct. at 1194 (quoting *Sealfon v. United States*, 332 U.S. 575, 579, 68 S.Ct. 237, 239–40, 92 L.Ed. 180 (1948)); *see also United States v. Clark*, 613 F.2d 391, 400 (2d Cir.1979), *cert. denied*, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980). The defendant bears the burden to persuade the court that the issue she seeks to foreclose was "necessarily decided in [her] favor by the prior verdict." *United States v. Citron*, 853 F.2d 1055, 1058 (2d Cir.1988). The Second Circuit has previously noted that "[s]ince it is usually impossible to determine with any precision upon what basis the jury reached a verdict in a criminal case, it is a rare situation in which the collateral estoppel defense will be available to a defendant." *United States v. Tramunti*, 500 F.2d 1334, 1346 (2d Cir.), *cert. denied*, 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974). The Second Circuit also has noted, however, that although the ground of the acquittal generally cannot be ascertained, "the court should avoid making the defendant's burden overly difficult by straining to postulate 'hypertechnical and unrealistic' grounds on which the jury could conceivably have rested its conclusions." *United States v. Citron*, 853 F.2d at 1058. Further, "[l]imited ambiguity that exists in a jury verdict should be resolved, in accordance with the protections of the Double Jeopardy Clause, in favor of the defendant." *United States v. Hans*, 548 F.Supp. 1119, 1126 (S.D.Ohio 1982). It is with these standards in mind that the Court addresses the petitioner's claims.

In order to have convicted the petitioner on the charge of accessory to commit murder, the State would had to have proved beyond a reasonable doubt, first, that the petitioner had the specific intent that her mother be killed and, second, that the petitioner solicited, requested, importuned, intentionally aided or, as the trial court instructed, joined with Coleman to cause the death of her mother. *See* Conn.Gen.Stat. § 53a–8. Thus in order to acquit the petitioner on that count the jury had to find either that she did not have the specific intent that her mother be murdered, or that she did not solicit, request, importune, intentionally aid or join Coleman in the commission of the murder, or both.

In order to convict the petitioner of the crime of conspiracy to commit murder, the State must show "that an agreement was made between two or more persons 'to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators.'" *State v. Beccia*, 199 Conn. 1, 3, 505 A.2d 683 (1986). Conspiracy is a specific intent crime and intent is further divided into two elements. These are, first, the intent to agree and, second, the intent to commit the offense that is the object of the conspiracy. *Id.* at 3–4, 505 A.2d 683.

Therefore, by statute the only element common to both the accessory to commit murder charge and the conspiracy to commit murder charge is the intent that the petitioner's mother be killed. The petitioner, therefore, has the burden of persuading the Court that the jury, in acquitting her on the accessory to commit murder charge, necessarily determined that she did not have the intent that her mother be killed.

In support of her contention that principles of double jeopardy and collateral estoppel bar her retrial on the conspiracy to commit murder count, the petitioner advances two arguments. First, because she admitted that she performed the acts that constitute the *actus reus* element, the jury necessarily determined that she did not have the specific intent to commit murder. Second, the petitioner claims that, even if the Court concludes that the jury could have found that

she had the specific intent to cause her mother's murder, by adding a third element to the accessory charge, specifically, the word "join," the trial court collapsed the conspiracy charge into the accessory charge.

### A. *Specific Intent*

■ In order to address the petitioners claim that the jury by its acquittal on the accessory to commit murder charge found that she lacked the specific intent that her mother be murdered, the Court must first determine, as best as such matters can be determined, what the jury rationally concluded. A number of the petitioner's actions are not in dispute. These include that she wrote a number of letters to Coleman and made a number of diary entries during the summer of 1986. The trial court charged that the jury could consider the "various interpretations of the letters that have been put into evidence." 6/18/90 Tr. at 31 (accessory); 6/18/90 Tr. at 36 (conspiracy). One of these letters, State's Exh. R, was written after the plan between the petitioner and Coleman to stab her mother was abandoned. In that letter the petitioner wrote: "Remind me never to get my hopes up again about anything. I'm not going to be 'psyched' about anything that's promised in the future. I've had to (sic) much of that and promises are like water. One day you have a flood, the next, all the waters (sic) gone. Promises are very nice but I was taught never to promise anything unless I had an intention of carrying it out." Coleman testified that the promises to which the petitioner was referring involved their plan to kill her mother. The petitioner, on the other hand, testified that this plan referred to her running away. As noted above, the trial court instructed the jury that the letters were to be interpreted as reflecting on whether the petitioner had the specific intent that her mother be murdered. Thus the jury, faced with the fact that both Coleman and the petitioner admitted that this letter was written, had to decide whether it was evidence that the petitioner had the specific intent that her mother be murdered. The only rational conclusion that the Court can draw from the jury's acquittal of the petitioner on the charge of accessory to com-

mit murder is that the jury concluded that this letter was not evidence that the petitioner had the specific intent that her mother be murdered at the time of the actual killing. Otherwise, the jury rationally would have been compelled to convict the petitioner on the accessory count.

The petitioner also made several diary entries around the same time. *See* State's Exh. I and J. The diary entries also refer to the "plan" between the petitioner and Coleman. The petitioner testified that the plan referred to her running away from home and marrying Coleman and to his acting as her legal guardian. Coleman testified that the plan was to murder her mother. Thus again the jury was faced with the conflicting interpretation put forth by the petitioner's and Coleman's testimony. There is no question that the diary entries were made by the petitioner during the summer of 1986 and that they referred to a plan. The jury also was instructed that it was to consider the petitioner's testimony as reflecting on her intent. Once again, the only rational conclusion that the Court can draw from the jury's acquittal of the petitioner on the charge of accessory to commit murder is that the jury concluded that her diary entries were not evidence that

the petitioner had the specific intent that her mother be murdered at the time of the actual killing. Otherwise, the jury rationally would have been compelled to convict the petitioner on the accessory count.

There is also no question that the petitioner and Coleman discussed, during the summer of 1986, ways in which they could murder her mother. These included the sandwich incident, the stabbing of her mother and claiming self-defense [1], the flashing of the lights incident [2], using chloroform, and cutting the brake lines on her car. Only the sandwich incident, the stabbing discussion, and the flashing of the lights incident were addressed in any depth during the petitioner's trial, and only the sandwich incident was referred to by the trial court in its instructions to the jury.

■ Concerning the sandwich incident, Coleman testified that the petitioner told him that she was going to put some sleeping pills in her mother's sandwich. The petitioner, on the other hand, did not deny that she placed some drug in her mother's sandwich. There was some dispute, however, regarding whether these pills were sleeping pills or migraine headache medicine and whether it

---

1. Coleman testified that he and the petitioner had come up with a plan wherein the petitioner would stab her mother and then claim that she did it in self-defense because the mother's abuse of her would lend credence to that claim. The petitioner, however, decided that she could not go through with stabbing her mother herself and that Coleman would have to do it. As part of this later plan, the petitioner was to turn the living room lights in her house on and off and Coleman, who at the time lived in a house within sight of the petitioner's, would come over and kill her mother. The lights did flash, but Coleman did not attempt to carry out the plan. *See* Note 2 infra.

2. The petitioner testified that she had been in trouble with her mother over her relationship with Coleman. The petitioner told Coleman about this and during their discussions, the petitioner testified, she and Coleman were "venting [their] angry feelings" and the subject of killing her mother came up. She testified that she said that she could never kill her mother and Coleman said that he could do it. The petitioner testified that she would have to give Coleman some kind of signal, like flashing the living room lights, and he could come over to the house and kill her mother. She further testified that they

dismissed the idea as irrational. Later that day, however, after she had gone out and returned home with her mother, her mother accidently flashed the lights. The petitioner testified that she became scared that Coleman might come over and so she locked the kitchen door and drew the curtain so that "there was no way [Coleman] could get in." Coleman did not come over.

The petitioner testified that after this incident Coleman had written her a note in which he said that he saw the lights flash and thought that the petitioner wanted him to come to her house. The note also stated that Coleman became upset and told his father of the problems the petitioner was having with her mother and that he thought that the petitioner was angry because he did not come to her house after the lights flashed. After receiving this note the petitioner sent a note to Coleman in which she wrote that her "first reaction to [Coleman's] note was sheer anger. Being realistic, we both know we could never hurt my mom. I know I couldn't have stood by while someone else did." She also testified that she wanted to tell him that she was glad that he did not come over when the lights flashed and that she was hurt that he had misunderstood her. She also testified that the whole flashing of the lights incident was a miscommunication.

was two pills or an entire bottle or the remains of a bottle. The petitioner testified that she placed only two Fiorinal tablets in the sandwich and she did so only to calm her mother down. Jill Smith testified, however, that the petitioner told her that she placed the remainder of a bottle of sleeping pills in her mother's sandwich. The trial court instructed the jury on May 24, 1990, that the sandwich incident could not be used as a replacement act for the actual murder but that it could be used as evidence "to identify an intention to agree to cause the death on August 5th, 1987, or an intention to solicit, request, importune, intentionally—or intentionally aid in the causing of the death on August 5th, 1987." Thus the jury was instructed that the sandwich incident could be used to determine the intent on both the conspiracy and accessory counts. In its instructions at the end of the case, however, the trial court stated only that the sandwich evidence "may be used, if you so find, to identify an intention to agree to cause the death on August 5th, 1987." [3]

Although the jury could have rejected Coleman's and Smith's testimony concerning the contents of the bottle and the amount of the drug placed in her sandwich, because the petitioner admitted the salient facts surrounding this incident, the jury, in acquitting the petitioner on the charge of accessory to commit murder, rationally must have concluded that this incident was not evidence that the petitioner had the specific intent that her mother be murdered at the time of the actual killing. Otherwise, the jury rationally would have been compelled to convict the petitioner on the accessory count.

The information charged in count one is that the relevant time frame was between July 14, 1987 and August 5, 1987. It appears from the evidence that the discussions concerning murdering the petitioner's mother then ceased until after the petitioner returned from Woodstock, New York on July 14, 1987. The petitioner testified that her relationship with her mother improved as she spent more and more time with Alex Markov in Rowayton. Coleman testified that "towards the end of the third week of July, beginning of the fourth week of July [1987], talk about killing her mother came up again." Coleman testified that the petitioner told him that her mother was making her stay in Rowayton and continue her relationship with Alex and that she did not want to. He also testified that her mother was still putting pressure on the petitioner. Coleman testified that when the subject came up again, he "still didn't think it was a good idea. The situation was different at that time. My state of mind towards [the petitioner] was much more—I was much more involved than her. I would do more of what she would ask me. In summer of '86, we had more of an equal relationship. At this point in time, she was the dominant person in the relationship . . . so at this time I was less able to deny her."

On Friday, July 31, 1987, the petitioner left Glastonbury for Greenwich, to be followed by a trip to Binghamton, New York for a concert. Coleman testified that on the Tuesday night before the petitioner left on that trip, while speaking with her at her bedroom window, she again brought up the subject of having her mother killed. He testified that she was "crying on the other side of the glass when we were talking about it, and was demanding that it had to be done soon be-

3. When reviewing a cautionary instruction, like a supplemental charge, a court must view it in light of the trial court's charge to the jury as a whole. "To determine the correctness of a jury charge the charge must be 'read as a whole, and judged by its total effect rather than by its individual component parts.' *Blanchette v. Barrett,* 229 Conn. 256, 280, 640 A.2d 74 (1994)." *Stewart v. Federated Department Stores, Inc.,* 234 Conn. 597, 606, 662 A.2d 753 (1995). A court cannot isolate the supplemental charge from the main charge. They must be read together. *State v. Williams,* 199 Conn. 30, 41, 505 A.2d 699 (1986). As noted above, the trial court instruct-ed the jury at the time the sandwich incident was first introduced into evidence that it could be interpreted as bearing on the petitioner's intent with regard to the conspiracy and accessory counts. Thus, without any indication that the trial court later instructed the jury that it could consider this evidence *only* on the petitioner's intent to agree to have her mother murdered, this incident was still before the jury during deliberations as bearing on her intent to request, solicit, importune, intentionally aid or, as the trial court instructed the jury, join with Coleman in the commission of the crime.

cause she just couldn't stand it anymore." Coleman also testified that the petitioner told him that the murder "had to be done before she left on vacation, that she couldn't bear the thought of having to go on vacation with her mother and with the Markovs, and that [Coleman] had to do it before they left, which was that night." Coleman also testified that the petitioner called him from Greenwich the following night and asked him why he did not do it. He also testified that she asked him to feed her cats while she was away that weekend.

Coleman testified that during that first phone conversation with the petitioner on August 4, 1987, they had made a plan to kill her mother the following night, Wednesday, August 5, 1987. Coleman then testified that when he and the petitioner spoke in a telephone conversation later that evening she told him that she did not want to be at home when her mother was murdered and so they switched the plan to that night. He also testified that he had yet to speak with his friend, Chris Wheatley, to see if he was going to help Coleman dispose of the body. Coleman testified further that during the 9:00 p.m. conversation he told the petitioner that Wheatley had agreed to help and that the petitioner told him that her mother was at home.

The petitioner testified concerning these same conversations that she told Coleman that she really did not want to go but that she had to and that this would be the last time she would have to stay with the Markovs. She also stated that Coleman said that he did not want her to go and that he did not know why her mother was making her go on the trip. The petitioner also testified that she lied to Coleman and did, in fact, want to go on the trip with the Markovs and that she did not want Coleman to think that she was voluntarily spending time with Alex because she knew Coleman was jealous. With regard to the phone call she made from Greenwich to Coleman on Friday night, she testified that she asked Coleman to feed her cats over the weekend. She denied any discussion concerning killing her mother during that conversation.

The petitioner testified that after she returned from Binghamton on August 4, 1987, she had four telephone conversations with Coleman and two or three conversations with her mother. Her first conversation with Coleman was at approximately 3:00 p.m. that afternoon. She testified that she had called him to tell him that she had come back to Rowayton but that she was not going to be returning then to Glastonbury as she had expected but was instead staying in Rowayton. She also testified that she told him in that conversation that it was not necessary for him to feed the cats because her mother was going back to Glastonbury that day. When asked why she was not back in Glastonbury, the petitioner testified that she lied to Coleman, telling him that her mother was making her stay in Rowayton, because she did not want Coleman to get mad at her. The petitioner also testified that in that first conversation when she told Coleman that she was not coming home he said "Oh, no, I left a note for you. I hope she doesn't find it." When the petitioner asked Coleman where he had left it and he said "[i]n your sheets," the petitioner said "[d]on't worry, she won't find it there." The petitioner testified that Coleman did not tell her the substance of that note.

The petitioner also testified that she spoke with her mother approximately one and one-half hours later and that her mother told her that the cats had torn the house apart and that the petitioner had cleaning work to do when she came home. The petitioner testified that she spoke with Coleman again after her conversation with her mother in which she expressed surprise that the house in Glastonbury was messed up by the cats because supposedly he had gone in there to feed them over the weekend. She also told him that her mother was picking her up at the end of the day and that she should be home later on that evening. The petitioner also testified that she had another conversation with her mother that day during which her mother told her that her friend Shannon Dubois had called and that she had spoken with her for approximately thirty minutes and that the petitioner should call her when she got home. Her mother also told her in

that conversation that she had to finish the laundry when she came home that day.

The petitioner testified that she spoke with Coleman a third time that day but that she did not remember the substance of the conversation. The petitioner also testified that she spoke with Coleman on the telephone again when he called her that night at 9:00 p.m. During that conversation the petitioner told Coleman that she was coming back to Glastonbury the next day and that Coleman was upset that her mother was making her stay in Rowayton and that he stated that he hated "that she's trying to come between us, and sometimes I just wish I could kill her." The petitioner testified that she did not think he was serious.

The petitioner agreed that she participated in all of the phone calls before and after the Binghamton trip and had conversations with Coleman outside her bedroom window before the trip. The petitioner, however, disputed the content of these conversations. The petitioner argues that since the jury acquitted her on the accessory to commit murder count, it necessarily must have concluded that she did not have the specific intent to cause her mother's murder.

The trial court instructed the jury to consider the following evidence as to count one:

> Besides the evidence you would be considering for the first element, you would consider for the second as well—you should consider the testimony of Dennis Coleman that on Thursday before the defendant's trip to Rowayton, and then onto Binghamton, that at her window, crying, she begged him to kill her mother so she wouldn't have to go; that on August 4th, in a phone conversation, she said her mother would be coming home alone, and that she did not come home because she did not want to be present when the act of the killing occurred, but would be—would be by in the morning to clean up, and that after a phone call from her mother that she was tired and going to bed, she called Dennis back and told him she—her mother was tired and going to bed; and the defendant's testimony that she lied to Dennis about not wanting to go to Binghamton, and that she was looking forward to it, and

her relationship with her mother had improved, and she denied asking him to kill her mother.

Viewing the entire record in this case in a practical and rational manner, as the Court must, and rejecting the hypertechnical and archaic approach to collateral estoppel, it is clear that the only rational interpretation of the acquittal on the accessory to commit murder charge is that the jury necessarily must have concluded that the petitioner did not have the specific intent to cause her mother's death. First, there were a number of conversations in the days leading up to the murder and a flurry of phone calls between the petitioner and Coleman on the day of the murder. Coleman testified that the petitioner begged him to kill her mother during the conversation before she left for Binghamton and that she was mad at him for not killing her before they left. He also testified concerning the petitioner's statements in their phone conversations on the day that she returned from New York. Even assuming that the jury rejected Coleman's testimony concerning these events, however, there is no dispute that the petitioner told Coleman that her mother would be home on the night of the murder. Thus even if it found that she had not begged Coleman to murder her mother, the jury was left with the fact that the petitioner, during the flurry of phone calls between her and Coleman, specifically told him that her mother was home on the night of the murder. If she had done this one act alone, which she readily admits, with the specific intent that her mother be murdered, the jury rationally would be compelled to convict her.

It would be a hypertechnical application of the collateral estoppel doctrine if the Court were to conclude that the jury could have found, in the context of the entire record in this case, that even though the petitioner wanted to kill her mother, she did not tell Coleman that her mother was home on the night of the murder with the intention that her mother be killed. Such a conclusion would stretch the collateral estoppel doctrine beyond its rational bounds. It also would be a hypertechnical application of the collateral estoppel doctrine, again, viewing the entire

record of this case and the events leading up to the murder, to conclude that the jury could have found that the petitioner had the specific intent to murder her mother but that at the time that the petitioner told Coleman that her mother was at home alone, she did not know that this information would aid him in the commission of the murder. Setting this inquiry in the practical framework of this case, and viewed with an eye to all the circumstances of the proceedings, *see Ashe,* 397 U.S. at 444, 90 S.Ct. at 1194, the only rational interpretation of the verdict is that the jury necessarily must have concluded that the petitioner did not have the specific intent that her mother be murdered. Thus the Court finds that the jury must necessarily have concluded that the petitioner did not have the specific intent to cause her mother's death.

### B. The Conspiracy Charge Claim [4]

■ The petitioner next claims that, even if the Court concludes that the jury could have found that the petitioner had the specific intent to cause her mother's murder, by adding a third element to the accessory charge, specifically, the word "join," the trial court collapsed the conspiracy charge into the accessory charge. Thus, the petitioner argues, because she was acquitted on the accessory count, even if the jury found that she had the specific intent that her mother be murdered, it necessarily found that she did not agree to "join" in a conspiracy with Coleman. To place the petitioner's claim in the proper context, it is necessary again to review the trial court's charge on both counts.

The trial court instructed the jury that instead of the two essential elements of the crime of accessory to commit murder, there were three elements. The trial court instructed the jury as follows:

There are three elements the State must prove beyond a reasonable doubt in order

to warrant a conviction: First, the defendant intended to cause the death of her mother; second, with the intent to cause her mother's death, she solicited, requested, commanded, importuned or intentionally aided Dennis Coleman to cause her mother's death; and, third, acting with these intentions, she intended to aid, assist or join Dennis Coleman in the commission of the murder of her mother.

The petitioner claims that the ordinary meaning of "join" is to agree and that the trial court, by adding the "join" element to the accessory instruction, negated the distinction between the conspiracy count and the accessory count and, in fact, collapsed the conspiracy charge into the accessory count.[5]

As an initial matter, the State's argument that "after the error was pointed out, the court subsequently reinstructed the jury at length on the elements of the statutes," *see* State's Memorandum in Opposition at 28, is unsupported by the record. The trial court, in fact, after the petitioner had placed her objections to the jury charge on the record, stated that "[t]here are 22 exceptions to the charge of the court. The court isn't going to go through each one. There is nothing in any one of them to warrant the court to give further instructions." It was only after the jury had requested further instruction on the conspiracy count on June 20, 1987 that the trial court reinstructed the jury on the elements of accessory to commit murder and conspiracy to commit murder and, in doing so, did not explain that its earlier charge was in error or whether the new instructions were to be considered in the context of the court's charge as a whole.

■ "An erroneous statement in a charge to a jury may be cured by a later correct instruction which may be made when the jury is called back or returns for further instructions. *Ziskin v. Confietto,* 137 Conn. 629, 633, 79 A.2d 816; *Hurlburt v. Sherman,* 116 Conn. 102, 107, 163 A. 603. This is

---

4. Even in light of the above conclusion, the Court will address the petitioner's remaining grounds for habeas corpus relief.

5. The Connecticut Supreme Court reviewed the trial court's instruction on the accessory count and concluded that the trial court separated the

"join" element from the accessorial liability element as it was charged in the accessory count. It found that, although the charge was incorrect, it did not weaken the State's burden on the accessorial liability charge.

particularly true where the court makes an immediate correction. *Craney v. Donovan*, 95 Conn. 482, 484, 111 A. 796. The corrected instruction must remove from the minds of the jury any erroneous impression. Maltbie, Conn.App.Proc. s 94. It has been held that a final and definite instruction cured earlier defective statements. *Budovsky v. Hadhazi*, 95 Conn. 388, 398, 111 A. 179." *State v. Wright*, 169 Conn. 256, 262, 362 A.2d 983 (1975). Here, after review of the trial court's original instruction and its supplemental instruction, it is far from conclusive that the supplemental instruction removed from the minds of the jury the erroneous impression. All the trial court stated when reviewing the elements in the supplemental charge was that it was "going to make it a little more simple ... [and that it was] going to break both statutes into two essential elements."

The trial court instructed the jury on the conspiracy count that the State must prove beyond a reasonable doubt three elements. The trial court stated that:

First, there must be an agreement between the defendant and Dennis Coleman; secondly, the agreement must be entered into with the intent to cause the death of another person, and that, namely, is Joyce Aparo; and following—and, three, following the agreement, there must be an overt act by any one of them to effect the object of the agreement.

The trial court, in expanding on the first element, charged the jury that

"[i]t is not necessary for the State to show that the defendant knew all the conspirators or the entire agreement. It is enough if he knows he is—or she knows she is *joining* with at least one other person in

an agreement to cause—to commit the crime." *Id.* at 36 (Emphasis added).

The trial court repeated that portion of the charge when it reinstructed the jury on conspiracy. Thus viewing the charge as a whole, it appears that the trial court's instruction did, in fact, collapse the distinction between the different counts. Although the charge was erroneous and the supplemental instruction failed adequately to correct the error, and although the trial court did collapse the distinction between the statutes, the question remains whether under this instruction the jury necessarily found that the petitioner did not intend to join in an agreement with Coleman to commit murder. After careful review of the trial court's cautionary instructions, original jury charge, and supplemental instructions, the Court finds that the jury did so find.

First, the trial court instructed the jury that it was to consider the same evidence on the conspiracy count as it did on the accessory count. As it specifically relates to the conspiracy count, the jury was instructed to consider, *inter alia*, the various interpretations of the letters and diary entries, and the nature and content of the phone calls between the petitioner and Coleman. Second, in view of the fact that the trial court specifically instructed the jury to consider the sandwich incident in regard to the intent element of the accessory and conspiracy counts, and the Court has found nothing in the record to indicate that it later limited these instructions, and in view of the fact that the petitioner admitted all salient facts surrounding her conduct, the only rational conclusion is that the jury determined that the petitioner did not possess the intent to "join" with Coleman in the commission of the murder.[6]

**6.** The Court notes that the trial court, in denying the petitioner's Motion to Dismiss, stated in its November 20, 1991 decision that "[i]n reviewing the court's instructions to the jury on the First Count, the court without question did not equate 'joining' with 'agreeing', an essential element of the conspiracy count. The law is clear that an agreement is not one of the elements of the crime of murder and therefore the jury's acquittal of the defendant on Count One was not a determination that there was no agreement between the defendant and Dennis Coleman to murder Joyce Aparo. This is also evidenced by five members of the jury voting to convict the defendant on

Count Two, thereby finding that the defendant did enter into an agreement with Dennis Coleman." 11/20/91 Mem. at 5. This conclusion begs the question. The Court cannot rely upon the five votes for conviction to support a finding that the petitioner possessed the intent to cause her mother to be murdered. As the Connecticut Supreme Court has held, a non-unanimous jury "cannot render any finding of fact." *State v. Daniels*, 207 Conn. 374, 388, 542 A.2d 306 (1988). The collateral estoppel analysis must focus on a valid and final judgment, not an inconclusive vote of the jury.

## II. *The 7–5 Vote for Acquittal*

 The petitioner next claims that because she had a statutory and constitutional right to be tried by a jury of six on the conspiracy count, and because she obtained at least six votes in favor of acquittal, a retrial on the conspiracy count is barred by both the Fifth Amendment Double Jeopardy Clause and the Fourteenth Amendment Due Process Clause. This claim is without merit.

 As the Connecticut Supreme Court has held, a non-unanimous jury "cannot render any finding of fact." *State v. Daniels,* 207 Conn. 374, 388, 542 A.2d 306 (1988). The seven votes in favor of acquittal thus are legally irrelevant.

### CONCLUSION

For the reasons set forth above, the petition for a Writ of Habeas Corpus is hereby GRANTED. This matter is hereby ORDERED remanded to the State of Connecticut Superior Court for the Judicial District of Hartford/New Britain at Hartford with directions to dismiss Count Two of the Information.

SO ORDERED.